# EXHIBIT H
# (PART 1)

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

C

Briefs and Other Related Documents
Texas Technical Institute, Inc. v. Silicon Valley, Inc.S.D.Tex.,2006.Only the Westlaw citation is currently available.

United States District Court,S.D. Texas, Houston Division.
TEXAS TECHNICAL INSTITUTE, INC., Plaintiff,
v.
SILICON VALLEY, INC., et al., Defendants.
No. Civ.A. H-04-3349.

Jan. 31, 2006.

David E. Bensey, David W. Anderson, Waldron Schneider et al, Houston, TX, for Plaintiff.
Aaron B. Chausmer, Berman Fink et al, Benjamin I. Fink, Freed & Berman, Atlanta, GA, Edna Michelle Bohreer, Sesha S. Kalapatapu, Boyar & Miller, David E. Bensey, Waldron Schneider et al, Houston, TX, for Defendants.

*Memorandum, Recommendation, and Order*
SMITH, Magistrate J.
**\*1** This lawsuit concerns the sale of the Houston campus of a technical school. The purchaser, Texas Technical Institute, Inc. (TTI) brings suit against the seller, Silicon Valley, Inc., and its president, Akber Mithani (collectively "Silicon Valley"), asserting contract and tort claims. Silicon Valley is countersuing TTI and Suzanne VanCapelle, the president and sole shareholder of TTI, for breach of lease. Before the court is Silicon Valley's motion for summary judgment on TTI's claims against it (Dkt.42), and Silicon Valley's motion for partial summary judgment on their counterclaim against TTI (Dkt.44). Silicon Valley also moves to exclude TTI's expert testimony and strike the expert report (Dkt.46). A hearing was held on these motions January 19, 2006. For the reasons that follow, the court recommends that the two motions for summary judgment be granted, and finds the motion to exclude is moot and will therefore deny it.

*Background*

In late March 2003, Silicon Valley accepted an offer by VanCapelle to purchase the assets of Silicon Valley's Houston campus. Shortly thereafter VanCapelle formed Texas Technical Institute, Inc. as the corporate entity to operate the venture,[FN1] and over the next several months VanCapelle and her sister Nancy Robinson, acting on TTI's behalf, performed a due diligence review of Silicon Valley's business and records.[FN2]

FN1. *See* Dkt. 42, Ex. A.

FN2. *See* Dkt. 42, Ex. D, 54-57; Dkt. 51, Ex. B.

On October 1, 2003, the parties signed an asset purchase agreement, and the campus and school were transferred as an ongoing concern from Silicon Valley to TTI.[FN3] VanCapelle operated the school until April 21, 2004, when it closed for financial reasons. At that point, VanCapelle urged Silicon Valley to repurchase the school. When Silicon Valley refused, TTI filed this suit.[FN4]

FN3. *See* Dkt. 42, Ex. B.

FN4. *See* Dkt. 51, Ex. B.

TTI asserts claims for breach of contract, fraud, negligent misrepresentation, and detrimental reliance related to this transaction.[FN5] Defendants Silicon Valley and Mithani in turn allege that TTI and VanCapelle breached their obligations under the purchase agreement by failing to pay the rent on the lease that TTI assumed from Silicon Valley.[FN6] Federal jurisdiction is based on the diverse citizenship of the parties, as Silicon Valley and Mithani are Georgia residents, while TTI and Suzanne VanCapelle are citizens of Texas.

FN5. *See* Dkt. 1, Ex. 3 (Pl.'s Am. Orig. Pet.).

FN6. *See* Dkt. 6.

*Analysis*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The party moving for summary judgment must demonstrate that there are no genuine issues of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

material fact. *Provident Life & Accident Ins. Co. v. Goel,* 274 F.3d 984, 991 (5th Cir.2001). In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on its pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Caboni v. General Motors Corp.,* 278 F.3d 448, 451 (5th Cir.2002). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

I. *Silicon Valley's Motion for Summary Judgment on TTI's Claims*

A. *Breach of Contract*

**\*2** TTI's amended petition alleges only a single [FN7] breach of contract by Silicon Valley-*i.e.,* "failing to provide the number of [student] accounts represented." [FN8] Dkt. 1, Ex. A, ¶ 9. The familiar elements of a breach of contract claim under Texas are: (1) the existence of a valid contract; (2) the performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach. *See, e.g., Lewis v. Bank of Am. NA,* 343 F.3d 540, 544-45 (5th Cir.2003).

> FN7. Silicon Valley's motion seeks to recast several of TTI's misrepresentation claims as contract claims, but the court will address these claims as actually pleaded by TTI.

> FN8. In response to TTI's claims, Silicon Valley and Mithani initially challenge TTI's standing to assert these causes of action. The defendants assert that TTI was not a party to the purchase offer or the asset purchase agreement because it was not a signatory, nor was it incorporated until after these agreements were signed. This contention fails because under Texas law, a corporation may sue to enforce or recover damages for the breach of a pre-organization contract. *See Moore v. Dallas Post Card Co.,* 215

S.W.2d 398, 401 (Tex.Civ.App.-Dallas 1948, writ refused, n.r.e.); *see also Trinity Fire Ins. Co. v. Kerrville Hotel Co.,* 129 Tex. 310, 103 S.W.2d 121, 126 (Tex.1937) (hotel could enforce pre-incorporation contract after adopting and ratifying same); *see generally* 1A William Meade Fletcher et al., Fletcher Cyclopedia of Private Corporations § 214 (2005) (if a contract is one inuring to the corporation, and it has adopted the contract of otherwise succeeded to it, it has a right to enforce the contract or sue for breach in either its own name, or with the promoter). Texas law also appears to allow claims based on pre-incorporation fraud. *See, e.g., Moore,* 215 S.W.2d at 404. Accordingly, TTI has standing to bring these claims against the defendants.

TTI does not cite any specific contract provision explicitly requiring Silicon Valley to provide any particular number of student accounts. It is not even clear whether the operative agreement to which TTI refers is the purchase offer or the asset purchase agreement. In any event, VanCapelle has admitted in her deposition that Silicon Valley provided all the enrolled student accounts it had, which is consistent with its obligation to transfer business assets under either agreement. [FN9] At the hearing, TTI did not challenge the factual accuracy of VanCapelle's admission, nor did TTI explain how its contract claim could survive in light of this admission. For this reason, TTI cannot establish the contract breach it alleged, and Silicon Valley is entitled to judgment as a matter of law on this claim.

> FN9. *See* Dkt. 42, Ex. C, 206.

B. *Fraud*

TTI asserts that Silicon Valley committed fraud by misrepresenting the financial condition of the school and by falsely stating that the school was in compliance with Texas Workforce Commission (TWC) regulations for state-licensed career schools. [FN10] To prove fraud under Texas law, a plaintiff must show that: (1) the defendant made a false material representation consisting of either a positive untrue statement of material fact, the concealment of a material fact, or nondisclosure of a material fact which he had a duty to disclose; (2) the defendant knew the material representation was false or made it recklessly without any knowledge of its truth; (3) he made the representation with the intent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

that it should be acted upon by the plaintiff; (4) the plaintiff acted in reliance upon the representation, and (5) the plaintiff suffered injury. *See Gibraltar Sav. v. LDBrinkman Corp.,* 860 F.2d 1275, 1298-99 (5th Cir.1988). TTI has failed to establish a genuine issue of material fact on these elements with respect to either fraud claim.

FN10. *See* Dkt. 1, Ex. A, ¶ 10.

1. Financial Condition

TTI's contention that the financial condition of the school was misrepresented is not based on any affirmative statement of past or existing fact by Silicon Valley. Instead, this claim hinges on a promise contained in section 15 of the purchase offer, entitled "Maintenance of Goodwill," which reads in pertinent part:
Until possession is delivered, SELLER agrees to continue to operate the business in the manner in which it is being operated at the date of this offer and to maintain the goodwill of the business and all personal property in normal working order subject to the exceptions and/or exclusions listed below....This also specifically means SELLER shall not raise or lower selling and/or service prices, raise or lower employee wages, fire, lay off or make other substantive changes in company personnel, modify existing credit terms or make any other substantive change to standard operating procedures or the assemblage of fixtures, machinery or other operating equipment in affect [sic] a[t] the time of this offer without first notifying PURCHASER in writing of such need or intention to do so and obtaining PURCHASER'S written approval for such actions.[FN11]

FN11. Dkt. 42, Ex. A.

*3 According to TTI, Silicon Valley did not honor its commitment "to continue to operate the business in the manner in which it is being operated at the date of this offer [*i.e.,* March of 2003]." In particular, TTI points to a dramatic decrease in revenues, student enrollments, classes conducted, and marketing efforts between March 2002 and the date of purchase in October 2003.

This claim is deficient in several respects. First of all, VanCapelle was unquestionably aware of the decline in the school's financial condition prior to the

October closing date. On May 29, 2003, after the purchase offer was extended, and well before the final decision to purchase the school was made, VanCapelle sent an e-mail to Alex Mithani specifically commenting, with respect to advertising and enrollments, that "[b]oth are down."[FN12] VanCapelle continued:

FN12. Dkt. 75, Ex. E.

I recognize that you wish to minimize all costs until closing, but what is your strategy to ramp enrollment up again prior [to] the close so that "normal operating levels" are in place[?] This can certainly be worked around, probably easier in a live conversation together than via e-mail.[FN13]

FN13. Dkt. 75, Ex. E (emphasis added).

This knowledge of the decline in the school's financial condition was facilitated by TTI's due diligence inspection of Silicon Valley's operations and financial records. Suzanne VanCapelle's sister, Nancy Robinson, was deposed as the corporate representative of TTI under Federal Rule of Civil Procedure 30(b)(6). In that deposition, Robinson testified that she spent between two to three weeks at the Houston campus on this due diligence inspection, which included a review of every student file.[FN14] She conceded that there were no concealments or false information provided by Silicon Valley during due diligence.[FN15] Robinson further explained that while some "mistakes" were made, they were not material to the deal.[FN16] By virtue of its due diligence review, TTI had ample notice of Silicon Valley's true financial condition prior to closing. In light of this knowledge, TTI has no credible claim of justifiable reliance upon a prior false promise regarding continued operations.

FN14. *See* Dkt. 42, Ex. D, pp. 54-57.

FN15. *See* Dkt. 42, Ex. D, pp. 67-68.

FN16. A. I actually went to the campus and went through all of the student files....
....
Also, I went through and did an inventory check of, you know, all of the computers and stations and stuff like that. So, I was able to go through every student file, right, and everything was in there....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Okay. So, then, [I] took the net income statements and verified it, like, verified it against the students. And then, verified the advertising that had been done. And this was early on. All of this was early on.

....

Right. And verified the-like, really verified everything that was on the net income statement, everything I could.

....

You know, there were some things that weren't on what they had provided. They were-they were minor things. I would not say it was a misrepresentation of those things, but there were mistakes. There were all sorts of mistakes.

Q. The mistakes you would expect to find in a business, and you could correct them; and they wouldn't be material?

A. And I asked for verification or justification on those things.

Q. Was it provided?

A. In most cases.

....

A. Okay. There were some things that I never did get the information for. Again, they were-you're talking about the due diligence time; is that correct?

Q. Correct.

A. But they weren't big things. It wasn't-it wasn't anything I was concerned over.
Dkt. 42, Ex. D, pp. 54-57.

In any event, the "continue to operate" clause cannot reasonably be read as a guarantee that revenues, enrollment, and classes would be maintained at precisely the same levels through the time of closing, regardless of any external business or marketing conditions. Given the context, the more natural reading of the clause is that Silicon Valley would not impair existing good will by shutting its doors, raising fees, or making other substantive changes to standard operating procedures without TTI's approval. Standing alone, even a dramatic decrease in revenue does not imply a change in standard operating procedure by Silicon Valley. In other words, maintaining standard operating procedures in the face of changing market conditions is no guarantee against declining revenue.

Even if the "continue to operate" clause were construed as broadly as TTI contends, there is still no evidence that Silicon Valley failed to comply. The clause obligates Silicon Valley to continue to operate the business in the same manner as it was "at the date

of this offer," which is March 2003. There is no evidence whatever establishing a baseline of revenues, student enrollment, classes conducted, or marketing efforts as of that date. Instead, TTI points to decreases as measured from March and September of 2002. Absent any reason to believe that a significant portion of these decreases occurred after the baseline date of March 2003, there is no basis to hold Silicon Valley responsible for financial conditions which (as far as the summary judgment record shows) pre-existed TTI's purchase offer.

*4 Lastly, TTI has offered no evidence of intent to commit fraud by Silicon Valley. Because this fraud claim is based on a false promise rather than a misrepresentation of existing fact, TTI has the burden of proving that Silicon Valley intended not to perform at the time the promise was made. *Gibraltar Sav. v. LDBrinkman Corp.,* 860 F.2d 1275, 1299 (5th Cir.1988). Ultimate failure to perform a promise is not evidence of initial intent not to perform. *Id.* at n. 36. TTI has offered no evidence whatever suggesting that Silicon Valley acted with the requisite intent.

In sum, there is no substantial evidence that Silicon Valley materially misrepresented or concealed the school's financial condition. Nor is there evidence that Silicon Valley made a knowingly false promise that the school's financial condition would not decline after March 2003. In fact, TTI was aware of the school's declining revenue well before the purchase was consummated, and so could not have reasonably relied on any representations to the contrary. Silicon Valley is entitled to summary judgment on this claim.[FN17]

> FN17. Silicon Valley also asserts that the merger clause contained in the asset purchase agreement bars this fraud claim. Under Texas law, "a fraud claim can be negated where a merger clause evinces a party's clear and unequivocal expression of intent to disclaim reliance on specific representations." *Armstrong v. American Home Shield Corp.,* 333 F.3d 566, 571 (5th Cir.2003). The merger clause in this case does not disclaim reliance, however, and unlike *Armstrong* there are no other contract provisions from which a clear intent to disclaim reliance may be inferred. Accordingly, the merger clause is not sufficient ground in itself to bar TTI's fraud claims.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

### 2. TWC Compliance

TTI fares no better on its remaining fraud claim regarding the purported violation of Texas Workforce Commission rules. The source of this claim is Article 2 of the asset purchase agreement, in which Silicon Valley represented that it "has to its knowledge operated the business in accordance with all laws, ordinances, and rules relating to the business." TTI maintains that this assurance was false, and alleges broadly that Silicon Valley committed numerous violations of many TWC rules.

TTI has no evidence of a finding by the TWC itself that Silicon Valley was in violation of its rules and regulations. Instead, to support its assertion of noncompliance, TTI relies on: (1) warnings issued by the TWC in 2002; and (2) an affidavit submitted by VanCapelle.

With respect to the TWC warnings, Silicon Valley had advertised and enrolled students in early 2002 before the TWC issued a required certificate of approval. By letter dated March 21, 2002, the TWC warned Silicon Valley that if it continued such practices, no certificate of approval would be issued.[FN18] TWC's concerns about the pre-certification advertising and enrollments were obviously resolved to its satisfaction, because a certificate of approval was issued on May 15, 2002, and a renewed certificate of approval was issued the following year.[FN19] The certificate recites that Silicon Valley "has met the legal requirements prescribed in Chapter 132, Texas Education Code, and is hereby authorized to operate....Continued approval will be subject to compliance with the legal requirements for proprietary schools...." [FN20] From this evidence the only reasonable inference is that Silicon Valley was in full compliance with TWC rules and regulations at all times relevant to this transaction.

FN18. *See* Dkt. 73, Ex. A. These documents were obtained by TTI pursuant to a Texas Open Records Act request, and filed with the court two days before the summary judgment hearing. The court admitted these late-filed documents over Silicon Valley's objection.

FN19. *See* Dkt. 51, Ex. 16.

FN20. Dkt. 51, Ex. 16.

The only other evidence TTI offers that Silicon Valley violated TWC rules and regulations is in the form of an affidavit from VanCapelle, which lays a host of fraudulent wrongdoing at the feet of Silicon Valley. Silicon Valley objects to the affidavit as conclusory and not based on personal knowledge.

*5 Federal Rule of Civil Procedure 56(e) provides that an affidavit supporting or opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Affidavits not based on personal knowledge or that are based merely on information and belief do not satisfy the requirements of Rule 56(e), and those portions of an affidavit that do not comply with Rule 56(e) are not given weight or considered in deciding a motion for summary judgment. *See Richardson v. Oldham,* 12 F.3d 1373, 1378-79 (5th Cir.1994). Conclusory affidavits are also insufficient to create or negate a genuine issue of fact. *See Travelers Ins. Co. v. Liljeberg Enters., Inc.,* 7 F.3d 1203, 1207 (5th Cir.1993). Although the admissibility of the affidavit may be questionable,[FN21] the court will consider it for purposes of this summary judgment motion. Even so, its conclusory nature is insufficient to create a genuine issue of fact.

FN21. The affidavit makes conclusory assertions based almost entirely upon unauthenticated records apparently obtained from Silicon Valley. TTI attempts to invoke the business records exception to the hearsay rule, but no custodian or other qualified witness from Silicon Valley has laid the foundation for admissibility on this ground. VanCapelle's affidavit asserts that "except where otherwise indicated," these records were made by an employee or representative of TTI at or near the time of the act or event recorded. But this predicate cannot possibly apply to documents which were obtained from Silicon Valley, which in many instances predate the creation of TTI itself in April/May 2003. It is true that, upon pro per authentication, statements in these documents could be admissible as admissions by a party-opponent under Federal Rule of Evidence 801(d)(2). Because Silicon Valley has offered no evidence that the documents it produced are not authentic, the court will treat these documents and VanCapelle's affidavit as admissible for purposes of this motion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

VanCapelle's affidavit is a farrago of largely unsubstantiated assertions about Silicon Valley's business practices. Specifically with respect to the TWC, VanCapelle alleges that "SV maintained its licensure with TWC by deceit, it made omissions, provided fraudulent documents and records in its representation to TWC during investigations and audits, TWC Rules & Regulations (see TTI # 12)." [FN22] TTI # 12 is ninety-two pages of Texas Workforce Commission rules and regulations rather than evidence showing non-compliance with those rules and regulations. The affidavit continues with similar blunderbuss charges of TWC rules violations related to student refunds, over-charging, and inaccurate class schedules. But VanCapelle was neither an employee or agent of the TWC. Her conclusions that these violations occurred are entirely based on her subjective belief and opinion rather than on personal knowledge of any of the transactions.

FN22. Dkt. 51, Ex. B.

Another problem with this affidavit is that it contradicts much of Robinson's deposition testimony without explaining why. Robinson was deposed as a corporate representative of TTI under Rule 30(b)(6), and offered binding testimony on behalf of the corporation. *See* Fed. R. Civ. P. 30(b)(6); *see also* *Hyde v. Stanley Tools,* 107 F.Supp.2d 992 (E.D.La.2000) (because there is no distinction between a Rule 30(b)(6) corporate representative and the corporation, the corporation may not defeat a summary judgment motion with an affidavit that directly contradicts an earlier Rule 30(b)(6) deposition). She testified that there were no material misrepresentations during the due diligence period and that other than a few minor mistakes, she was able to verify and justify student records, accounts, net income statements, and advertising. No explanation is offered to explain this conflict between the deposition testimony of TTI's corporate agent and the affidavit of TTI's president. Under federal summary judgment procedure, when the sole evidence purporting to create a genuine issue of material fact is an affidavit that contradicts deposition testimony, the party offering the affidavit must provide an explanation of that conflict. *Copeland v. Wasserstein, Perella & Co., Inc.,* 278 F.3d 472, 482 (5th Cir.2002). A party may not defeat a motion for summary judgment using an affidavit that impeaches, without explanation, its sworn deposition testimony. *See Doe v. Dallas Indep. Sch. Dist.,* 220 F.3d 380, 385-87 (5th Cir.2000); *S.W.S. Erectors, Inc. v. Infax,*

*Inc.,* 72 F.3d 489, 495 (5th Cir.1996). VanCapelle's affidavit is therefore insufficient to preclude summary judgment for Silicon Valley on this fraud claim.

### 3. Non-Disclosure

*6 Finally, TTI's pleadings might be generously construed to assert fraud based not only on affirmative misrepresentation, but also upon fraudulent non-disclosure or concealment. For purposes of this motion, the court will indulge the assumption that TTI's pleadings would satisfy the particularity requirements of Rule 9(b) with regard to fraud claims.

Texas courts have recognized fraudulent non-disclosure claims, which require the same elements of proof as other types of common law fraud, "with the exception that the misrepresentation element can be proven by the non-disclosure or concealment of material facts *in light of a duty to disclose." United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.,* 414 F.3d 558, 567 (5th Cir.2005) (emphasis supplied). In an ordinary buy-sell transaction conducted at arms-length, there is no affirmative duty of disclosure. Non-disclosure is neither fraudulent, nor negligent, unless there is first a duty to disclose the information. *Bradford v. Vento,* 48 S.W.3d 749, 755 (Tex.2001); *Insurance Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998). Moreover, no general duty of disclosure arises between parties contemplating a contract. *Jabri v. Alsayyed,* 145 S.W.3d 660, 670 (Tex.App.-Houston [14th Dist.] 2004, rehearing overruled); *Fleming v. Texas Coastal Bank of Pasadena,* 67 S.W.3d 459, 461 (Tex.App.-Houston [14th Dist.] 2002, pet. denied).

Generally a duty to disclose arises only where there is a fiduciary or confidential relationship between the parties. *See Morris,* 981 S.W.2d at 674; *see also United Teacher,* 414 F.3d at 566 (noting in dicta that some courts "have not gotten the message ... that a duty to disclose can[not] exist in Texas absent a confidential or fiduciary relationship"); *Sergeant Oil & Gas Co., Inc. v. National Maintenance & Repair, Inc.,* 861 F.Supp. 1351, 1358 (S.D.Tex.1994) ("When no representations are made, the failure to disclose information does not constitute fraud in the absence of a fiduciary or other special relationship between the parties").

There are two types of fiduciary relationships. The first is a formal fiduciary relationship which arises as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a matter of law, typified by such relationships as a partnership, attorney-client, and principal-agent. *See Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998); *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex.1980). The second is an informal fiduciary relationship which may arise "from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex.1998). To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit. *See id. at 288.*

There was no formal fiduciary relationship between TTI and Silicon Valley. There is also no suggestion of an informal fiduciary relationship between these parties based on a confidential relationship existing prior to the sale of the technical school; the only connection between TTI and Silicon Valley is the transaction that is the basis of this suit. On this record, Silicon Valley was under no duty to disclose material information about this transaction to TTI.

*7 Finally, Robinson's deposition testimony conceding that Silicon Valley did not hide any information from TTI during the due diligence process would preclude a fraudulent non-disclosure claim, even assuming the presence of a duty to disclose. For these reasons, Silicon Valley is entitled to summary judgment on any claim of fraud by non-disclosure.

### C. Negligent Misrepresentation

In its amended petition, TTI asserts that in the course of the negotiations for the sale of the Houston campus, the defendants falsely represented: (1) that the annual revenue of the school was more than it was; (2) that the school was licensed and operating in accordance with the rules and regulations of the TWC; and (3) other matters relating to the defendants' marketing efforts and student loan facilities.[FN23]

FN23. *See* Dkt. 1, Ex. A, ¶ 11.

Under Texas law, a claim for negligent misrepresentation consists of four elements: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a

pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *General Elec. Capital Corp. v. Posey*, 415 F.3d 391, 395-96 (5th Cir.2005). However, "Texas law does not recognize a duty to avoid negligent misrepresentations arising from an arms-length, at-will relationship." *Coburn Supply Co., Inc. v. Kohler Co.*, 342 F.3d 372, 377 (5th Cir.2003). " '[I]n order to prove negligent misrepresentation, [the plaintiff] must, as a threshold matter, prove that [the defendant] owed her a duty.' " *Id.* (quoting *Steptoe v. True*, 38 S.W.3d 213, 219-20 (Tex.App.-Houston [14th Dist.] 2001, no pet.)).

At the motion hearing, TTI acknowledged that the sale of the technical school was an arms-length transaction and that no special or fiduciary relationship existed between the parties. Moreover, when asked to specifically identify the misrepresentation that it was asserting, TTI merely referred back to its intentional misrepresentation claim, leaving no identifiable claim for negligent misrepresentation that exists apart from the cause of action for fraud.

Justifiable reliance is no less required for a claim of negligent misrepresentation than it is for fraud. Generally, reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context. *Coastal Bank ssb v. Chase Bank of Texas, N.A.*, 135 S.W.3d 840, 843 (Tex.App.-Houston [1st Dist.] 2004); *Swank v. Sverdlin*, 121 S.W.3d 785, 803 (Tex.App.-Houston [1st Dist.] 2003, writ denied). This is because a party to an arms-length transaction must exercise ordinary care and reasonable diligence for the protection of her own interests, and failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *See Coastal Bank*, 135 S.W.3d at 843.

*8 The sale of the school was an arms-length transaction in which the seller was under no duty to avoid negligent misrepresentation, and the buyer could not reasonably have relied on such misrepresentations, assuming any were made. Silicon Valley is entitled to summary judgment on the negligent misrepresentation claim.

### D. Detrimental Reliance

Not Reported in F.Supp.2d                                                          Page 8
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

In its amended petition, TTI asserts as a separate cause of action, "detrimental reliance," reiterating its prior allegations against the defendants.[FN24] At the motion hearing, TTI acknowledged that detrimental reliance is not an independent cause of action and this acknowledgment is consistent with Texas law. *See, e.g., Ludman v. Pacific Southwest Bank, F.S.B., 1998 WL 834677, at *3 (Tex.App-Dallas, 1998)* ("detrimental reliance" is an element of promissory estoppel, not a separate tort); *Garner v. Corpus Christi Nat. Bank, 944 S.W.2d 469, 480 (Tex.App.-Corpus Christi 1997, writ denied)* ("reliance" is not an independent case of action but an element of other causes of action). Thus, summary judgment should issue on this claim as well.

FN24. *See* Dkt. 1, Ex. A, ¶ 12.

## II. *Silicon Valley's Motion for Partial Summary Judgment on their Counterclaim against TTI*

Silicon Valley is entitled to summary judgment on its contractual counterclaim based on TTI's failure to pay rent under the assumed lease.[FN25] As part of the asset purchase agreement, TTI assumed the lease from Silicon Valley, with Silicon Valley remaining secondarily liable.[FN26] The asset purchase agreement also contains an indemnification clause whereby "Buyer shall indemnify and hold Seller harmless from any and all liabilities that may arise as a result of acts performed or not performed by Buyer or Buyer's employees, agents, or assigns at or subsequent to the time of closing."[FN27]

FN25. Silicon Valley seeks summary judgment solely against TTI in this motion. *See* Dkt. 45, n. 1.

FN26. *See* Dkt. 44, Ex. B.

FN27. Dkt. 42, Ex. B.

TTI took possession of the Houston campus on October 1, 2003, and remained in possession until April 22, 2004. At that point it discontinued operations and vacated the premises. TTI admittedly has paid no rent since February 2004, and the lease does not expire until approximately March 2007.[FN28] TTI contends that its obligation to pay rent is excused by the prior breach of contract by Silicon Valley and Akber Mithani, and relies upon *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc., 134 S.W.3d*

195, 196 (Tex.2004), for the proposition that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.[FN29]

FN28. *See* Dkt. 44, Ex. A (leased commenced January 2002 and has a term of sixty-three months).

FN29. TTI also argues that Silicon Valley and Mithani offer no evidence of damages caused by its failure to make rental payments, contending this to be a necessary predicate for a breach of contract claim. However, under Federal Rule of Civil Procedure 56(c), "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is genuine issue as to the amount of damages." Fed. R. Civ. P. 56(c). Thus, the absence of evidence of the amount of the breach does not preclude partial summary judgment. *See Trinet Corporate Realty Trust Inc. v. Microsoft Corp., 2004 WL 1217936, at *3 (N.D.Tex.2004)*.

While it is true in general that the material failure to perform on a contract by one party may suspend or discharge the other party's duty to perform, such an excuse for non-performance is an affirmative defense which TTI has the burden of proving. *See Hassell Constr. Co., Inc. v. Stature Commercial Co., Inc., 162 S.W.3d 664, 667 (Tex.App.-Houston [14th Dist.] 2005, no pet.); CDS Enterprises, Inc. v. Myrad Real Estate, Inc., 1999 WL 548226, at *5 (Tex.App.-Houston [14th Dist.] 1999, no pet.).* As analyzed in depth above, TTI has not in fact shown any breach of contract by Silicon Valley. It follows that TTI's failure to pay rent is not excused by the material breach doctrine.

*9 There is no dispute of material fact here. TTI assumed the lease. Paying rent was an obligation under the lease. TTI did not pay rent as required. TTI further agreed to indemnify Silicon Valley in such an event. Summary judgment should therefore issue on that portion of Silicon Valley's counterclaim seeking to establish liability for the breach of the lease.

## III. *Silicon Valley and Akber Mithani's Motion to Exclude TTI's Expert Testimony and Expert Report (Dkt.46)*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

In light of the court's recommendation of summary judgment in favor of Silicon Valley and Akber Mithani on TTI's claims against them, the motion to exclude TTI's expert testimony and expert report is moot. Accordingly, it is dismissed.

The parties have ten days to file written objections. Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See* Fed. R. Civ. P. 72.

S.D.Tex.,2006.
Texas Technical Institute, Inc. v. Silicon Valley, Inc.
Not Reported in F.Supp.2d, 2006 WL 237027 (S.D.Tex.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 734733 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiff's Objections to Magistrate Judge's Recommendations (Feb. 22, 2006) Original Image of this Document with Appendix (PDF)
• 2006 WL 734732 (Trial Motion, Memorandum and Affidavit) Plaintiff's Objections to Magistrate Judge's Recommendations (Feb. 9, 2006) Original Image of this Document (PDF)
• 2006 WL 432781 (Trial Motion, Memorandum and Affidavit) Defendants/Third-Party Plaintiffs' Response in Opposition to Plaintiff's and Third-Party Defendant's Motion for Discovery Sanctions (Jan. 31, 2006) Original Image of this Document (PDF)
• 2006 WL 432780 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Reply Brief in Support of Their Motion for Final Summary Judgment as to Plaintiff's Claims (Jan. 26, 2006) Original Image of this Document (PDF)
• 2006 WL 432779 (Trial Motion, Memorandum and Affidavit) Plaintiff and Counter-Defendant's, Texas Technical Institute, Inc., and Third Party Defendant's, Suzanne VanCapelle, Memorandum in Support of Motion for Discovery Sanctions (Jan. 18, 2006) Original Image of this Document (PDF)
• 2006 WL 432778 (Trial Motion, Memorandum and Affidavit) Plaintiff's Supplemental Response to Defendants' Motion for Summary Judgment (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 433571 (Trial Pleading) Plaintiff's Second Amended Complaint (Jan. 17, 2006) Original Image of this Document (PDF)
• 2005 WL 3660662 (Trial Motion, Memorandum and Affidavit) Response to Defendants' Motion for Final Summary Judgment as to Plaintiff's Claims (Dec. 2, 2005) Original Image of this Document (PDF)
• 2005 WL 3987464 () (Report or Affidavit of Douglas A. Dickey) (Dec. 1, 2005)
• 2005 WL 3133390 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Motion for Final Summary Judgment As to Plaintiff's Claims (Nov. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 3133391 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Defendants' Motion to Exclude Plaintiff's Expert Testimony and to Strike Plaintiff's Expert Report (Nov. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 2577819 (Trial Motion, Memorandum and Affidavit) Defendants and Third-Party Plaintiffs' Reply in Support of Their Motion to Compel Discovery Against Plaintiff and Third-Party Defendant (Aug. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 3987463 () Oral Deposition of Douglas Allen Dickey (Jul. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2298578 (Trial Motion, Memorandum and Affidavit) Defendants and Third-Party Plaintiffs' Memorandum of Law in Support of Their Motion to Compel Discovery Against Plaintiff and Third-Party Defendant (Jul. 15, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 2298577 (Trial Pleading) Lizzeth Rowan's Complaint in Intervention (Jul. 7, 2005) Original Image of this Document (PDF)
• 2004 WL 2882875 (Trial Pleading) Counter-Defendants, Texas Technical Institute, Inc. and Suzanne Vancappelle's Original Answer (Sep. 21, 2004) Original Image of this Document (PDF)
• 4:04cv03349 (Docket) (Aug. 23, 2004)
• 2004 WL 3524791 (Trial Motion, Memorandum and Affidavit) Defendants and Third-Party Plaintiffs' Response to Lizzeth Rowan's Motion to Intervene (2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 3623295 () Affidavit of Douglas Dickey, Cpa (2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6 of 7 DOCUMENTS

HELLENIC STEEL CO AND OTHERS v SVOLAMAR SHIPPING CO LTD AND
OTHERS (THE "KOMNINOS S")

COURT OF APPEAL (CIVIL DIVISION)

*[1991] 1 Lloyd's Rep 370*

**HEARING-DATES:** 10, 11, 20 December 1990

20 December 1990

**CATCHWORDS:**

Carriage by sea -- Limitation of liability -- Damage to cargo -- Proper law of contract -- Cargo found to be damaged on discharge -- Whether vessel unseaworthy -- Whether proper law of contract English or Greek -- Whether carriers entitled to limit liability.

**HEADNOTE:**

The plaintiffs' cargo of steel coils was shipped in apparent good order and condition on board the defendants' vessel Komninos S at Thessaloniki Greece for carriage to Ravenna and Ancona.

On the previous voyage Komninos S had carried 2500 tonnes of marine salt from Spain to Thessaloniki. She arrived there on Mar 3, 1987 and discharge of the salt was completed on Mar 10, 1987. The holds were then cleaned first with sea water and then with fresh water.

Loading of the steel cargo commenced on Mar 11, 1987. The weather was very cold, the temperature falling to -- 7 deg C. The coils were brought alongside the vessel on open trucks. Loading was completed on Mar 13, 1987 and the hatches were closed.

On the way to Ravenna the vessel encountered fairly heavy weather on Mar 14, 15 and 16, 1987. The master did not ventilate the cargo and on discharge at Ravenna the Ravenna cargo was found to have been damaged by corrosion but no claims were made on the owners in respect of the Ancona consignment of steel coils.

The possible causes of the damage to the steel coils were (a) water introduced with the cargo; (b) condensation; (c) seawater entering the cargo spaces and (d) failure to pump the bilges.

The plaintiffs claimed damages alleging that the vessel was unseaworthy and that the defendants acted negligently.

The principle issues of law were whether the proper law of the contract was English or Greek; if English whether the Hague-Visby Rules applied; and if not whether the defendants could rely on the exclusion clauses in the bills of lading to exclude or limit their liability.

-- Held, by QB (Com Ct) (LEGGATT, J), that (1) there was very little water carried on board the ship in the coils; when the hatches were closed the mass of the coils caused the temperature of the warmer entrapped air to fall below its dewpoint with the result that moisture condensed on to the exposed surfaces of the coils causing rust; the moisture ran off the coils onto the tank tops and due to the trim of the vessel by the stern, the resulting water concentrated in the after end of each hold; that water could collect in this way must have been due to a failure to pump out the bilges; and the rate of corrosion of the steel coils was considerably increased by the presence of salt left there by insufficient cleaning of the holds;

(2) the effective causes of the damage were the failure to clean the holds sufficiently and the failure to pump the bilges; in both omissions the master and crew were negligent and both rendered the vessel unseaworthy by rendering her unfit to carry the cargo of steel coils; the extent of the damage was increased by the fact that the receivers did not immediately open up and deal with the cargo;

[1991] 1 Lloyd's Rep 370

(3) the bills of lading contained no express choice of law but the facts, that the contract was made in Greece between Greek shippers and Greek managers to carry Greek steel from Greece to Italy for freight payable in Greek currency, indicated that Greek law was the proper law of the contract;

(4) under Greek law the exemption clauses did not apply; to escape liability the defendants had to bring themselves within exception of perils of the sea or act of shipper; although some of the damage was caused by the receivers' failure to deal immediately with the goods there was no evidence of the amount of damage so caused and 5 per cent would be deducted from the total damages recoverable under this head;

(5) the application of foreign limitation law was governed by the Foreign Limitation Periods Act, 1984 ss 1 and 2; under Greek law the plaintiffs' claims were time barred but it would constitute undue hardship if the plaintiffs were prevented from pursuing their claim by an incident of foreign law by which the parties did not realize that their contract was governed; that hardship outweighed any suffered by the defendants by reaon of the plaintiffs being able to take advantage of Greek law which excluded reliance on exemption clauses; by virtue of the Act Greek rules of limitation conflicted with public policy and did not apply; the plaintiffs' claims succeeded.

The defendants appealed.

-- Held, by CA (LLOYD, NOURSE and BINGHAM LJJ), that (1) the parties intended their contracts to be governed by the law of the forum where disputes were to be tried; there were no indications which displaced this inference and the parties, by virtue of cl 24 of the bill of lading (which provided inter alia that all disputes should be referred to British Courts) intended English law to govern their contracts;

(2) Greece was not a contracting state to the Hague-Visby Rules; the bills of lading were not issued in a contracting state and the carriage was not from a port in a contracting state and art X(a) and (b) of the Hague-Visby Rules had no application; and it was impossible to conclude that the words "All disputes to be referred to British Courts" amounted to a provision that the legislation of the United Kingdom giving effect to the Rules should govern the contract;

(3) the Hague-Visby Rules were not incorporated and the shipowners were entitled to rely on the exemption clauses in the bill of lading; the appeal would be allowed;

(4) if the proper law of the contract was Greek, the exemption clauses would have been void in Greek law and the cargo-owners would have been entitled to recover

## CASES-REF-TO:

Amin Rasheed Shipping Corporation v Kuwait Insurance Co, (HL) [1983] 2 Lloyd's Rep 365; [1984] AC 50;
Compagnie D'Armement Maritime SA v Compagnie Tunisienne de Navigation SA [1970] 2 Lloyd's Rep 99; [1971] AC 572;
Coast Lines Ltd v Hudig & Veder Chartering NV, [1972] 1 Lloyd's Rep 53; [1972] 2 QB 34.

## INTRODUCTION:

This was an appeal by the defendants Svolamar Shipping Co Ltd the owners of the vessel Komninos S from the decision of Mr Justice Leggatt ([1990] 1 Lloyd's Rep 541) given in favour of the plaintiffs Hellenic Steel Co the owners of a cargo of steel, Forsidera SpA, the endorsees of the bill of lading and others and holding that the cargo-owners were entitled to claim damages from the defendants for damage caused to their cargo while on board the defendants' vessel.

## COUNSEL:

Mr Richard Aikens, QC and Mr David Garland for the defendants Mr Michael Colins, QC and Mr Giles Caldin for the plaintiffs.

## JUDGMENT-READ:

Judgment was reserved.  Thursday Dec 20, 1990

## PANEL: LLOYD, NOURSE, BINGHAM LJJ

## JUDGMENTBY-1: BINGHAM LJ

[1991] 1 Lloyd's Rep 370

**JUDGMENT-1:**

BINGHAM LJ: This appeal concerns a cargo of steel coils which belonged to the plaintiffs in the action ("the cargo-owners"). It was shipped aboard the defendant shipowners' vessel Komninos S at Thessaloniki in March, 1987 and carried to Ravenna under contracts of carriage contained in or evidenced by two bills of lading. The vessel reached Ravenna on Mar 18 and discharge was completed on the 23rd. After discharge the cargo was found to have been seriously damaged by water.

In February and March, 1988 cargo insurers, having failed to obtain compensation, sought from the shipowners a three-month extension of time to issue proceedings. They treated time as due to expire on Mar 18, 1988 and threatened the issue of proceedings in the United Kingdom if an extension were not granted. An extension of three months starting from Mar 18 was granted by the shipowners and their P and I Club without prejudice to liability. The parties were unable to settle their differences and on June 16, 1988, just before expiry of the three-month extension, the cargo-owners' solicitors issued a writ in the High Court, claiming damages in breach of contract and duty, bailment and negligence. Application was in due course made and granted to serve the writ on the shipowners in Cyprus, where the shipowners are incorporated, on the grounds that the cargo-owners were claiming damages for breach of a contract which contained a term to the effect that the High Court should have jurisdiction to hear and determine any action in respect of the contract (RSC, O 11, r 1(1)(d)(iv)). The shipowners were duly served.

The cargo-owners' points of claim pleaded a claim in standard form for damages amounting to a little over US$200,000 and interest. The shipowners' points of defence denied the claim, put the damage to the cargo in issue and relied on two exemption clauses in the bills of lading (cll 8 and 20). A month or so before the trial the cargo-owners served points of reply. In these they pleaded that the proper law of the contracts of carriage was Greek and that under Greek law the exemption clauses on which the shipowners relied were void. Alternatively, the cargo-owners pleaded that the proper law of the contracts of carriage was English, and so included the Hague-Visby Rules, art III, r 8 of which rendered void the exemption clauses on which the shipowners relied. The shipowners rejoined, pleading (among other things) that the proper law of the contracts was not Greek but English, that the Hague-Visby Rules were not incorporated, that the exemption clauses were effective to protect the shipowners and that if Greek law did apply the cargo-owners' claim had become time barred by the passage of a year after discharge without service of proceedings.

The action was heard by Mr Justice Leggatt in November 1989 and in a judgment handed down on Dec 20, 1989 (see [1990] 1 Lloyd's Rep 541) he found for the cargo-owners and awarded damages (in Italian lira) of about £140,000 including interest. He found that the cargo had been damaged as a result of the shipowners' failure to clean the holds adequately before the voyage and to pump the bilges during the voyage, both of which omissions were negligent and rendered the vessel unseaworthy. These conclusions have not been challenged on appeal and I need say no more about them. The Judge also held that the cargo damage had been increased as a result of the receivers' failure to deal with the cargo promptly, on which score he reduced the cargo-owners' damages by 5 per cent and that the damaged cargo had no scrap value: these findings have given rise to subsidiary issues on the appeal.

The main legal issues before the Judge and before us concerned determination of the proper law of the contracts of carriage and the consequences of that determination. The Judge's ruling central to this appeal were these:

(1) The proper law of the contracts was Greek, being the system of law with which the transaction had its closest and most real connection: [1990] 1 Lloyd's Rep 541 at p 544, col 2.

(2) Under Greek law the exemption clauses in the bills of lading were void, and so did not protect the shipowners: ibid, at p 544, col 2.

(3) Under Greek law the cargo-owners' claim was time barred, but the English Court was not obliged to and would not apply the Greek time bar because its application would cause undue hardship and so conflict with English public policy: ibid at p 545, col 1.

(4) If, contrary to his ruling (1), English law was the proper law of the contracts, the Hague-Visby Rules were not incorporated, and the shipowners were entitled to rely on the exemption clauses: ibid at p 545, col 2.

(5) If, contrary to his rulings (1) and (4), English law was the proper law of the contracts and the Hague-Visby Rules were incorporated, the shipowners could not rely on the exemption clauses because of art III, r 8 of those Rules: ibid at p 546 col 2.

[1991] 1 Lloyd's Rep 370

Ruling (2) was not in issue before the Judge and has been common ground before us. It has also been common ground throughout that art 148 of the Greek Code had the effect of barring the cargo-owners' claim if proceedings were not served within one year of the cargo's discharge, such period being incapable of extension by agreement. With those exceptions the Judge's ruling were and remain contentious.

The proper law of the contracts

Neither party challenged the correctness of r 180 in Dicey and Morris, The Conflict of Laws (11th ed, vol 2, at p 1161):

The term "proper law of a contract" means the system of law by which the parties intended the contract to be governed, or, where their intention is neither expressed nor to be inferred from the circumstances, the system of law with which the transaction has its closest and most real connection.

Nor was it suggested that this was a case in which the parties had in terms expressed their intention as to the law which should govern the contracts.

Mr Richard Aikens, QC for the shipowners submitted that this case fell within sub-r 2 of Dicey and Morris' r 180 (ibid, p 1182):

When the intention of the parties to a contract with regard to the law governing the contract is not expressed in words, their intention is to be inferred from the terms and nature of the contract, and from the general circumstances of the case, and such inferred intention determines the proper law of the contract.

In submitting that the parties' inferred intention was that English law should govern the contracts, Mr Aikens relied first and foremost on cl 24 of the bills of lading:

In case any controversies arise with respect to the construction of the foregoing terms the English text alone to be conclusive. All dispute[s] to be referred to British Courts.

This, it was submitted, should be understood as an agreement to refer disputes to English Courts and there was nothing to displace the ordinary inference that the parties intended the substance of the contracts to be governed by the law of the chosen forum. This submission was reinforced by reference to: (1) cl 17 of the bills of lading, which provided:

General Average to be adjusted according to York-Antwerp Rules of 1950. The Adjustment shall take place in London and [it] shall be binding for both shippers and consignees. The vessel's value to be ascertained in London shall be the standard for the average adjustment. The General Average deposits and the expenses to be distributed according to the same principles . . . shall be fixed at London and in £ Sterling or in any other currency at owners option the same as any further contribuiton resulting therefrom shall be payable in £ Sterling or in any other currency at owners' option .
. .

(2) cl 8 of the bills of lading, which referred to "Act of God", an English law expression; (3) cl 20, which set a limitation in sterling on claims per package or per tonne; (4) cl 22, which set a limitation in sterling on claims for valuable cargo.

It was further submitted, in reliance on observations of Lord Denning, MR in Coast Lines Ltd v Hudig & Veder Chartering NV [1972] 1 Lloyd's Rep 53; [1972] 2 QB 34 that since cll 8 and 20, the exemption clauses, were void in Greek law and valid in English law (apart from the Hague-Visby Rules), the parties should be taken to have intended the contracts to be governed by English law. Mr Aikens did not, I think, suggest that these additional references on their own could have supported the inference that English law was intended by the parties to be the proper law, and he acknowledged that "Act of God" had become an international rather than an English term of art following its incorporation in the Hague Rules in 1921-1922, but given the terms of cl 24 he submitted that the inference was clear.

Mr Michael Collins, QC for the cargo-owners resisted this submission. The reference to "British Courts" in cl 24 was, he argued, equivocal, since it would cover Courts in Scotland and Northern Ireland, and in colonies such as Hong Kong, Gibraltar and the Falkland Islands, as well as England. The learned Judge accepted that the reference to "British Courts" was equivocal: [1990] 1 Lloyd's Rep 541 at p 544, col 1.

Mr Collins submitted that no inference could be drawn as to the parties' intended choice of law and that accordingly the case was one to which Dicey and Morris' sub-r 3 to r 180 applied (ibid at p 1190).

[1991] 1 Lloyd's Rep 370

When the intention of the parties to a contract with regard to the law governing it is not expressed and cannot be inferred from the circumstances, the contract is governed by the system of law with which the transaction has its closest and most real connection.

Mr Collins pointed out that there is some overlap between the processes envisaged by sub-rr 2 and 3, since the process of construction involved in the application of sub-r 2 necessarily involves (like any other process of construction) consideration of all the surrounding circumstances, which is the essential basis of a decision under sub-r 3. This is true, and has the formidable support of Lord Wilberforce (Amin Rasheed Shipping Corporation v Kuwait Insurance Co, [1983] 2 Lloyd's Rep 365 at p 373; [1984] AC 50 at p 69). There is nonetheless a clear difference in the purpose for which the surrounding circumstances are considered under the two sub-rules. Under sub-r 2 it is to ascertain the parties' contractual intention (meaning their actual, not their imputed, intention: what they would have said if asked at the time). Under sub-r 3 it is to determine, objectively and irrespective of the parties' intention, with which system of law the transaction has its closest and most real connection. This involves the application of a rule of law, not a process of contractual construction. It is doubtless no accident that this same dichotomy is reproduced in the Rome Convention, scheduled to the Contracts (Applicable Law) Act, 1990 but not yet in force.

Applying sub-r 3, Mr Collins submitted that the system of law with which the transaction had its closest and most reall connection was that of Greece. That was the place where the contracts were made, where the vessel was managed, where the cargo came from, where the cargo was shipped. That was the nationality of the managers and the shippers. There was provision in the booking note that freight should be paid in Greek currency in Greece at rates of exchange prevailing in Greece (but these provisions did not appear in the bills of lading and cannot, I think, have affected cargo-owners other than the shippers). These features, Mr Collins submitted, heavily outweighed the non-Greek features of the transaction: the Cypriot nationality of the shipowners, the Panamanian flag of the vessel, the Italian Port of discharge, the provision for general average adjustment in London, the references to sterling, United States dollars and Deutsmarks in the bills of lading and the choice of British Courts to resolve disputes. The Judge accepted this argument: ibid at p 544, col 1.

The first question is whether the reference to "British Courts" in cl 24 was, as the cargo-owners submitted and the Judge held, equivocal. Mr Collins was doubtless correct in describing the Courts of British colonial dependencies as "British", and of course one is aware of the resentment understandably caused by those who from ignorance or arrogance, treat "British" as a synonym for "English" or "English" as a synonym for "British". But we are here construing an international maritime contract to ascertain what, if any, intention should be attributed to the parties to it. Whatever the constitutional niceties, it seems to me altogether far-fetched, in truth a lawyer's point, to suppose that the parties can have meant or intended to embrace the Courts of British dependencies overseas. I intend no disrespect at all to the highly distinguished Judges who sit in Scotland and Northern Ireland when I say, further, that it is scarcely less far-fetched to suppose that the parties can ave meant or intended to embrace those Courts. It is widely known that the Commercial Court and the Admiralty Court, both parts of the High Court, deal on a daily basis with a wide range of international maritime business, much if not most of it referred by agreement to English law or jurisdiction. No doubt for historical and geographical reasons, no other Court in the United Kingdom enjoys that reputation or dispatches that business. It would, in this class of contract between foreigners, be as unusual to find an express choice of a Scots or Northern Irish forum as it would to find agreement for general average adjustment in Edinburgh or Belfast rather than (as expressly agreed here) London. I feel as little doubt on this point as the cargo-owners' solicitors can have felt when they sought and obtained leave to serve out on the basis of a contract which provided that the High Court should have jurisdiction. While I respect the Judge's view that the reference in these bills was equivocal, I cannot share it.

Both sides made reference to the important House of Lords decision in Compagnie D'-Armement Maritime SA v Compagnie Tunisienne de Navigation SA, [1970] 2 Lloyd's Rep 99; [1971] AC 572, the cargo-owners for the proposition that a choice of forum is not conclusive as to the proper law, the shipowners for the proposition that a choice of forum, if not conclusive as to the proper law, is a very strong pointer. It is necessary to consider the case in a little detail.

The case arose out of a contract for the carriage by sea of a large quantity of oil from one port in Tunisia to another in instalments during the last three quarters of 1967. The shippers were Tunisian, the carriers French. The carriers owned or controlled five French flag tankers and it was contemplated by the parties at the time of the contract that vessels owned by the French carriers would be used, at least primarily, to carry the oil in something between a dozen shipments. The contract was negotiated in the French language in Paris between the presidents of the two companies at a meeting arranged by French shipbrokers engaged by the Tunisian shippers. The contract was recorded on an English language form of single voyage tanker charter-party. Since the contract was for a series of shipments over a period and

[1991] 1 Lloyd's Rep 370

was not for the charter of any vessel the form was not very apt.  The form as executed did, however, contain the following among other clauses:

13. This contract shall be governed by the laws of the flag of the vessel carrying the goods . . .

18. Any dispute arising during execution of this charterparty shall be settled in London, owners and charterers each appointing an arbitrator . . .

28. . . . . Shipments to be effected in tonnage owned, controlled or chartered by the Compagnie d'Armement Maritime SA . . .

After six shipments, prformed by vessels of five nationalities (only one of Them french), the contract broke down. Arbitrators were appointed and on a preliminary issue held the proper law of the contract to be French.  Mr Justice Megaw, on a special case, agreed with the arbitrators, holding that in the circumstances and on the arbitrators' findings cl 13 amounted to an express choice of French law.  The Court of Appeal reversed his decision, on the ground that no meaning could properly be given to cl 13 in the circumstances and that the choice of London arbitration in cl 18 was conclusive in favour of English law as the proper law.

On appeal by the French carriers the House of Lords unanimously held that the proper law of the contract was French.  A majority of the House (Lord Morris of Borth-y-Gest, Viscount Dilhorne and Lord Diplock) agreed with Mr Justice Megaw that in the circumstances cl 13 amounted to an express choice of the law of the French carrier's vessels. Lord Morris and Lord Diplock also held that cl 13, even if not in itself effective as a choice of law, was effective to negative any inference that might otherwise be drawn from cl 18 as to choice of law.  The minority (Lord Reid and Lord Wilberforce) did not construe cl 13 as an express choice of law, but regarded French as the system of law with which the transaction had its closest connection.  The connection of the transaction with France was, indeed, very close and the shippers appear to have accepted that if the House were free to apply the closest connection test the proper law would be French (per Lord Reid at p 103, col 1; p 584C).

This case is undoubted authority for the proposition that choice of an arbitral forum is not determinative of the proper law.  This must indeed be so, since so long as the court is concerned with ascertaining intention it cannot be bound by any rule of law to reach any given conclusion as to what the parties intended, and when it turns to consider the closest connection under sub-r 3 it must consider and weigh all relevant features of the transaction and not give preponderant weight to some features to the exclusion of others.  Noentheless, while rejecting the somewhat absolutist and doctrinaire approach of the Court of Appeal, the House did make plain the significance of choice of forum in ascertaining the parties' intentions.  Lord Reid described the choice of an English arbitral forum as "an important factor and in many cases it may be the decisive factor" (at p 103, cols 1 and 2; p 584E).  Lord Morris said at p 107, col 2; p 590G:

The circumstance that parties agree that any differences are to be settled by arbitration in a certain country may and very likely will lead to an inference that they intend the law of that country to apply.

Lord Wilberforce said at p 111, col 2; p 596B, D:

. . . That the selection of a certain place for arbitration and, by inference, of nationals or residents of that place as arbitrators, is an indication that the parties intended the law of that place to govern is a sound general rule . . .  So, unless otherwise constrained, I would regard the clause as a weighty indication, but one which may yield to others.

Lord Diplock said:

The fact that they have expressly chosen to submit their disputes under the contract to a particular arbitral forum of itself gives rise to a strong inference that they intended that their mutual rights and obligations under the contract should be determined by reference to the domestic law of the country in which the arbitration takes place, since this is the law with which arbitrators sitting there may be supposed to be most familiar.

He emphasized, as Lords Reid, Morris and Wilberforce had also done, that this was no more than an inference.

But he also emphasized at p 120, col 2; p 609E:

. . . I do not wish to throw any doubt upon the proposition that an arbitration clause is generally intended by the parties to operate as a choice of the proper law of the contract as well as the curial law and should be so construed unless there are compelling indications to the contrary in the other terms of the contract or the surrounding circumstances of the transaction.

[1991] 1 Lloyd's Rep 370

If, contrary to his submission, cl 24 of the bills of lading were to be understood as referring to English Courts, Mr Collins argued that the other features of the contracts (listed above) were so compelling as to outweigh any inference which might otherwise be drawn from the choice of forum. The learned Judge did not consider the matter on this assumption and we do not know what his conclusion was or would have been. In seeking, under sub-r 2, to infer the intentions of the parties from the terms of the contract set in its factual matrix, I would (as the authority just examined indicates one should) infer that the parties intended their contracts to be governed by the law of the forum where disputes were to be tried unless there were strong indications that they did not intend or may not have intended this result. I find no indication here which begins to displace the prima facie inference. If cl 24 did not exist, it would (I think) be impossible to draw any inference as to the parties' intentions. The sub-r 3 test would then have to be applied, and in the absence of any substantial connection with the English system of law, I would accept that the Greek system of law is that with which the transaction had its closest and most real connection. As it is, however, cl 24 did exist, and sub-rule 2 leads me to the conclusion that these parties intended their contracts to be governed by English law. I am vividly aware that this Court must be very slow to differ from the conclusion of an experienced commercial Judge on a matter of this kind, but the question has been fully argued and I am persuaded that he was wrong.

Incorporation of the Hague-Visby Rules

If, contrary to his submission, English law was the proper law of these contracts, Mr Collins argued that English law included the Hague-Visby Rules and accordingly invalidated the exemption clauses on which the shipowners relied. The Judge rejected this submission (which on his primary conclusion did not of course arise) and I agree with him.

The Hague-Visby Rules were given the force of law by the Carriage of Goods by Sea Act, 1971. By virtue of the Act and the Rules themselves the Rules apply (1):

. . . in relation to and in connection with the carriage of goods by sea in ships where the port of shipment is a port in the United Kingdom [s 1(3) of the Act].

(2) without prejudice to art X(c) of the Rules --

. . . in relation to any bill of lading if the contract contained in or evidenced by it expressly provides that the Rules shall govern the contract [s 1(6)(a) of the Act]

or if such express provision is contained in a non-negotiable receipt (s 1(6)(b) of the Act); and (3):

. . . to every bill of lading relating to the carriage of goods between ports in two different States if (a) the bill of lading is issued in a contracting State, or (b) the carriage is from a port in a contracting State, or (c) the contract contained in or evidence by the bill of lading provided that these Rules or legislation of any State giving effect to them are to govern the contract, whatever may be the nationality of the ship, the carrier, the shipper, the consignee or any other interested person (art X of the Rules].

Since the shipment was from Greece, s 1(3) plainly had no application. It was not suggested that these bills expressly provided that the Rules should govern the contract so as to trigger the application of s 1(6). Greece was not a contracting state, so the bills of lading were not issued in a contracting state and the carriage was not from a port in a contracting state, and art X(a) and (b) accordingly had no application. There was thus no question of the United Kingdom legislation applying automatically. It had to be incorporated. So the argument centred on art X(c). Here again Mr Collins did not, I think, argue that the bills provided that the Rules should govern the contracts. The question was whether, assuming the choice of an English forum showed an intention that English law should govern the contracts, the bills of lading "provided" that the legislation of the United Kingdom giving effect to the Rules should govern the contracts. Mr Collins submitted that this test was satisfied on the facts here, Mr Aikens that it was not.

The French text (which uses the expressions "prevoit" and "legislation") gives no assistance. We were referred to no relevant English authority. Nor had the researches of Counsel unearthed any foreign authority, which if it existed would be of obvious importance in interpreting an internaitonal convention. For this purpose one must eschew any approach to interpretation peculiar to this jurisdiction. In this context it is relevant to bear in mind that in many civil law systems, as I think, much stricter rules govern incorporation by reference than are accepted here. One must also, of course, bear in mind that these bills are negotiable instruments which may bind parties remote from the original contracts. Interpreting art X(c) as best I can, I find it impossible to conclude that "All dispute[s] to be referred to British Courts" amounted to a provision that the legislation of the United Kingdom giving effect to the Rules should govern the contract. The cargo-owners' insurers evidently thought otherwise or there would have been no need to seek an extension. But I see no escape from this conclusion.

[1991] 1 Lloyd's Rep 370

The consequence of concluding as I do, that the Hague-Visby rules were not incorporated is that the exemption clauses in the bills of lading protect the shipowners and the cargo-owners are unable to recover.  Given the undoubted negligence of the shipowners' servants or agents, this is at first blush an unattractive result.  I do not, however, think that in a purely commercial dispute of this kind one should strive to reflect a superficial view of the merits.  The fact is that the cargo-owners contracted on terms which expressly relieved the shipowners, their master and crew, of responsibility for any act, error, neglect or default in the management, stowage, navigation or preparation of the vessel or otherwise.  This judgment gives effect, for better or worse, to what the parties expressly agreed.  The result is that I would allow the appeal, set aside the Judge' sorder and enter judgment for the shipowners.  The issues on quantum do not therefore arise and we have not heard argument upon them.

Greek proper law

Had I, like the Judge, concluded that the proper law of these contracts was Greek, I would have shared his conclusion that, the exemption clauses being void in Greek law, the cargo-owners were entitled to recover.  I shall give my reasons very summarily.   :

Article 148 of the Greek Code provides that --

. . . the right to compensation for partial loss or damage of the shipped cargo is extinguished one year after its (the cargo's) delivery.

This period cannot be extended by consent.  Section 1 of the Foreign Limitation Periods Act, 1984 requires this Court, if determining this contractual dispute according to the Greek proper law, to apply the Greek limitation period.  But s 2 of the Act provides:

(1) In any case in which the application of section 1 above would to any extent conflict (whether under subsection (2) below or otherwise) with public policy, that section shall not apply to the extent that its application would so conflict.

(2) The application of section 1 above in relation to any action or proceedings shall conflict with public policy to the extent that its application would cause undue hardship to a person who is, or might be made, a party to the action or proceedings.

The learned Judge disapplied the Greek limitation period, in reliance on section 2(1) and (2).  He said (ibid, at p 545, col 1):

In these circumstances it would in my judgment constitute a real and undue hardship if the plaintiffs were to be denied the opportunity of pursuing their claim by an incident of foreign law by which the parties did not realise that their contract was governed.

Mr Aikens challenged this conclusion, but I agree with it and in any event regard it as a conclusion to which the Judge could properly come.

Mr Aikens also argued that even if the Greek limitation period were properly disapplied on grounds of undue hardship, the effect was to reinstate the common law position.  Thus, he argued, the Greek limitation period was substantive and the English Court would give effect to it unless it conflicted with English public policy which (in the absence of any common law provision deeming undue hardship to constitute a conflict with English public policy) it did not.  I would for my part incline to accept that the Greek limitation rule is one of substance no 6 procedure, since it speaks of extinguishing a right, but I am quite unable to accept that a foreign limitation period, once disapplied under s 2 (whether on grounds of undue hardship or other conflict with public policy), can spring up afresh and bar the plaintiff's claim.  Whether in that situation no limitation period applies, or whether the English Court will apply its domestic rules of limitation, it is unnecessary to decide, although the latter alternative seems to me clearly perferable.  Since the cargo-owners issued their proceedings within the English limitation period and within the period granted by the shipowners, and since the cargo-owners were entitled to recover if the exemption clause were disregarded, the result of applying Greek proper law is, as the Judge said, that the cargo-owners recover.

**JUDGMENTBY-2:** NOURSE LJ

**JUDGMENT-2:**

[1991] 1 Lloyd's Rep 370

NOURSE LJ: For the reasons given by Lord Justice Bingham, I agree that the proper law of the contracts created by the bills of lading was English law and that the Hague-Visby Rules were not incorporated therein. I would allow the appeal accordingly. I also agree with the views expressed by Lord Justice Bingham as to the further questions which would have arisen if the proper law of the contracts had been Greek and not English law.

**JUDGMENTBY-3:** LLOYD LJ

**JUDGMENT-3:**

LLOYD LJ: I also agree.

**DISPOSITION:**

Appeal allowed; cross-appeal dismissed; appellants to have their costs in this court and two-thirds of their costs in the court below; application for leave to appeal to the House of Lords refused.

**SOLICITORS:**

Norton Rose; Wm A Merrick & Co

WestlawUK

[1957] 1 Q.B. 247                                                                 Page 1

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

*247 Hornal v. Neuberger Products Ltd.
[Plaint No. O. 663.]; [1956] 3 W.L.R. 1034

Court of Appeal

CA

Denning, Hodson and Morris L.JJ.

1956 Oct. 10, 11; Nov. 20.

Burden of Proof--Standard of proof--Civil
action--Allegation of fraud-- Balance of probability.

Fraud.

In a civil action where fraud or other matter which
is or may be a crime is alleged against a party or
against persons not parties to the action, the
standard of proof to be applied is that applicable in
civil actions generally, namely, proof on the balance
of probability, and not the higher standard of proof
beyond all reasonable doubt required in criminal
matters; but there is no absolute standard of proof,
and no great gulf between proof in criminal and
civil matters; for in all cases the degree of
probability must be commensurate with the
occasion and proportionate to the subject-matter.
The elements of gravity of an issue are part of the
range of circumstances which have to be weighed
when deciding as to the balance of probabilities.

The plaintiff in an action for damages for breach
of warranty or, alternatively, for fraudulent
misrepresentation, alleged that the director of the
defendant company had in the course of
negotiations for the purchase of a used capstan lathe
stated that it had been reconditioned by a reputable
firm of toolmakers. The defendants denied that the
statement had been made. If it had been made the
director must have known it to be untrue.

The county court judge found that the statement
had been made, but held on the claim for breach of
warranty that it had not been made contractually.
On the claim based on fraud he said that he was

satisfied on the balance of probability that the
statement had been made, and that that was the
correct standard to apply; but that he would not
have been so satisfied if the criminal standard of
proof was to be applied. He gave judgment for the
defendants on the ground that the plaintiff had not
shown that he had suffered damage by relying on
the fraudulent misrepresentation; but he ordered
that the plaintiff should pay only one-fourth of the
defendants' costs. On appeal by the plaintiff and
cross-appeal by the defendants:-

Held, that the judge had applied the correct
standard of proof but that on the facts the plaintiff
had suffered damage and was entitled to judgment.

Dicta of Lord Sumner in Lek v. Mathews(1927) 29
Ll.L.Rep. 141, 164, and of Denning L.J. in Bater v.
Bater [1951] P. 35, 36-37; 66 T.L.R. (Pt. 2) 589;
[1950] 2 All E.R. 458 applied.

Thurtell v. Beaumont(1823) 1 Bing. 339
disapproved.

Preston-Jones v. Preston-Jones[1951] A.C. 391;
[1951] 1 T.L.R. 8; [1951] 1 All E.R. 124
distinguished.

APPEAL from Judge H. C. Leon, sitting at
Willesden County Court.

*248 The plaintiff, Jimmie William Frederick
Hornal, a precision engineer, wanted a Herbert No.
4 capstan lathe for the purpose of carrying out
certain contracts for work. He heard that the
defendants, Neuberger Products Ltd., had such a
lathe for sale and went to inspect it at their
premises, where he saw it in operation and talked to
the director and chief shareholder of the defendant
company, Mr. Neuberger. At the interview there
were present an engineer named Lynch employed
by the plaintiff and some of the defendants'
employees. They inspected the Herbert No. 4 lathe,
discussed it, and after some bargaining about the
price, the plaintiff agreed to take it. He signed a
purchase order dated October 13, 1954, but the
transaction was eventually completed on hire-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                                          Page 2

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

purchase terms, Neuberger Products Ltd. selling the machine for £415 to United Dominion Trust Ltd., who in turn let it on hire-purchase terms to the plaintiff.

The history of the machine was as follows: The lathe was manufactured by Alfred Herbert Ltd. in January, 1935, for the continental market. It was shipped to Germany in May, 1935. It was used in Germany for many years until in 1951 Mr. Neuberger, on behalf of Neuberger Products Ltd., bought it in Germany from its German owner for about £700. The German owner told him that it had been factory-reconditioned at their works in Germany, and Mr. Neuberger believed him. But nevertheless, when Mr. Neuberger imported the machine into England, in order to obtain it free of duty, he said it had not been reconditioned. He made a declaration that: "We hereby declare these goods free of duty as British returned goods, which have not undergone any process of renovation, repair, manufacture, alteration or addition while abroad." Mr. Neuberger made that declaration regardless of the truth, but, as it suited him to make it, he did so. In 1952 the machine was imported free of duty. The transport arrangements were made by the well-known toolmakers Soag Machine Tools Ltd.; and while it was in their hands they put a metal plate with the name "Soag Machine Tools" on it. They did it as an advertisement but not meaning to indicate that they had done any work on it. Neuberger Products Ltd. paid some £700 for the machine and took delivery. Mr. Neuberger soon found out that it had not been reconditioned at all. He was very angry about it and managed to persuade the German seller to refund him £300. He then himself did the work necessary to put the machine in good and sound working order. He had a new bar feed put in and the gears put right; but it did not cost him nearly as much as £300.

*249 After the plaintiff had taken delivery of the machine he discovered that a part of it - the turret - was defective; and in order to remedy it he had another turret fitted by the original manufacturers, Alfred Herbert Ltd., at a cost of £50 14s. 3d. That replacement took some seven weeks, during which the plaintiff was unable to use the lathe and suffered damage in consequence.

He thereupon brought an action against the defendants claiming damages for breach of

warranty and further or alternatively damages for fraud. In support of that claim he relied on several representations alleged to have been made to him by Mr. Neuberger when he inspected the machine, and in particular alleged that Mr. Neuberger had said to him: "The machine has been Soag reconditioned "; and he claimed that that was a contractual warranty or, alternatively, a fraudulent misrepresentation. The defendant company, by Mr. Neuberger, denied that he had spoken those words.

The hearing in the county court extended over 12 sittings and included four days of legal submissions. Judge Leon, who had invited the parties at an early stage to reach a settlement, gave judgment on June 6, 1956, in favour of the defendants; but his order as to costs required the plaintiff to pay only one-fourth of the defendants' costs. His findings and the reasons for his decision were as follows:-

He found that in the course of the discussion Mr. Neuberger did in fact say that the machine had been Soag reconditioned, but that he did not say anything else which amounted to a representation or a statement as to the immediate availability of the machine for work. In the judge's view both parties thought that the machine was fit for immediate use, though that had not been expressly stated.

Having said that he thought that the statement as to Soag reconditioning had been made, the judge considered the position in regard to the claim for breach of warranty, and said: "Had I been satisfied that when Mr. Neuberger made that statement he intended to be bound by it contractually ... and that the plaintiff so understood the statement, I should have had little difficulty in coming to the conclusion that the statement was made contractually. ... But so far from deciding that the plaintiff has discharged the onus of proof on a preponderance of probability, I am satisfied that it was nothing of the sort; this was a discussion between these two gentlemen; ... and I have no hesitation in holding that the plaintiff has failed to *250 prove that the defendants gave any warranty to him about the machine at all, and so I hold."

The judge then turned to consider the plaintiff's claim for fraudulent misrepresentation, based as it was on the same allegations as the claim for breach of warranty. The judge said that though the plaintiff and his witness Lynch were not very satisfactory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                    Page 3

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

witnesses, Mr. Neuberger was a man who was quite prepared to tell a lie if he thought that it was to his advantage, for he had told a deliberate lie to the customs authorities when he brought the machine in question from Germany to England. He continued: "I now have to consider whether the plaintiff has proved his case, and in order to do that I have to come to a conclusion on the very difficult question as to whether the proof required of him is no more than what has already satisfied me, that a certain statement was made, or whether the case has to be proved beyond all reasonable doubt. If I have to be satisfied beyond all reasonable doubt I say at once that I should not be so satisfied in regard to the statement that it was Soag reconditioned. I have come to the conclusion on the preponderance of probability that that statement was made; but in my view no jury would dream of convicting a defendant of a fraud based on that statement, and if I had to consider whether sitting as magistrates trying a case of false pretences I should convict Mr. Neuberger, I have no hesitation whatever in saying that I should not dream of doing so. But this case has not been proved by criminal standards at all."

The judge then added that Mr. Neuberger had made the statement to persuade the plaintiff to enter into the transaction and that to some extent the plaintiff had relied on the statement. But in order to succeed in an action for fraud it was not enough to show that a contract had been induced by a fraudulent misrepresentation unless some damage were shown by the plaintiff. On the evidence, the judge said, he found that this machine was worth quite as much as, and very likely more than, the plaintiff had paid for it, and accordingly could not see that the plaintiff had suffered any damage as a result of the misrepresentation. For that reason there must be judgment for the defendants.

The judge then considered in detail the question of the measure of proof in civil cases where fraud was alleged, though, as he stated, it would affect only the question of costs. On a review of the authorities the judge accepted that in Thurtell v. *251 Beaumont [FN1]- an insurance case where arson was alleged - the judge had directed the jury that they must be satisfied that the crime imputed to the plaintiff was as fully proved as would justify their finding him guilty on a criminal charge for the same offence; and that that direction was held to be right; but he pointed out that in those days neither a

plaintiff nor a defendant could give evidence; and having considered many other cases, including other insurance cases where judges of great authority had stated that the court must be satisfied "beyond all reasonable doubt," the "third party cases" where to establish a claim in a civil action it was necessary to prove a fraud or crime by a third party, the measure of proof in divorce cases, and in particular the judgment of Denning L.J. in Bater v. Bater, [FN2] the judge concluded that the standard of proof required in the present case was simply that the judge or jury must be satisfied on the preponderance of probability that the facts necessary to establish the cause of action had been proved, and that the only authority which would compel him to apply the higher standard of proof beyond all reasonable doubt was Thurtell v. Beaumont [FN3]; and inasmuch as that had been decided when neither plaintiff nor defendant could give evidence, and, moreover, was inconsistent with many later decisions, he was entitled to follow the later decisions. Accordingly, as he was satisfied on a preponderance of probability that Mr. Neuberger in fact made the statement alleged, that the machine was Soag reconditioned, it would be a representation for which the defendants would be liable if the plaintiff had been able to prove damage. But in default of proving damage, the plaintiff's claim must fail. The judge then made the order as to costs stated above.

FN1 (1823) 1 Bing. 339.

FN2 [1951] P. 35, 36-37; 66 T.L.R. (Pt. 2) 589; [1950] 2 All E.R. 458.

FN3 1 Bing. 339.

The plaintiff appealed on the ground that the judge had misdirected himself in holding that there had been no damage. The defendants cross-appealed on the order as to costs.

*Ralph B. Gibson* for the plaintiff. First, the judge, in holding that the statement "Soag reconditioned" was not a warranty, erred in that he took into account the plaintiff's subjective state of mind, contrary to the decision in Couchman v. Hill, [FN4] followed in Harling v. Eddy. [FN5][Routledge v. McKay [FN6] was also referred *252 to.] Secondly, the judge having found that damage was suffered, it was not open to him to hold that no damage in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                        Page 4

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

general sense had been suffered because the plaintiff got a machine worth as much as, if not more than, he had paid for it. Where there has been a fraudulent misrepresentation, it is sufficient for the plaintiff to show that damage flowed from the action taken in reliance on the misrepresentation; it is not necessary to show that damage flowed from the misrepresentation itself. [Peek v. Derry [FN7] was referred to.]

FN4 [1947] K.B. 554; 63 T.L.R. 81; [1947] 1 All E.R. 103.

FN5 [1951] 2 K.B. 739, 741; [1951] 2 T.L.R. 245, [1951] 2 All E.R. 212.

FN6 [1954] 1 W.L.R. 615, [1954] 1 All E.R. 855.

FN7 (1887) 37 Ch.D. 541, 565, 577; 4 T.L.R. 84.

[DENNING L.J. In Peek v. Derry [FN8] the shares were of no value; but what impressed the judge here is that the plaintiff got his money's worth.]

FN8 (1887) 37 Ch.D. 541, 565, 577; 4 T.L.R. 84.

Only in the capital value of the machine, and not in its use; and because he could not use it immediately he suffered loss. Moreover, it is probable that he paid more for it as "Soag reconditioned" than he would have done if it were not. It does not lie in the mouth of a person who makes a fraudulent statement to say that the other party did not rely on it. The measure of damage to be applied here is that formulated by Slesser L.J. in London County Freehold and Leasehold Properties Ltd. v. Berkeley Property and Investment Co. Ltd., [FN9] namely, the difference between what the plaintiff paid for this machine and what he would have paid but for the fraudulent statement. The measure of damage as formulated by Collins M.R. in McConnel v. Wright [FN10][namely, that in so far as the plaintiff had got an equivalent for the money lost, the loss he could claim as damages was diminished] was not intended to be the general measure of damages applicable in all cases of fraud. Mullett v. Mason [FN11] is also relied on.

FN9 [1936] 2 All E.R. 1039 , 1047-1048.

FN10 [1903] 1 Ch. 546, 553-555.

FN11 (1866) L.R. 1 C.P. 559.

*Samuel Stamler* for the defendants. On the claim for breach of warranty the judge did not regard the plaintiff's subjective state of mind as decisive. He correctly applied well-established principles of law in holding that the statement was not made contractually and that the plaintiff knew that it was not so made; that is a finding of fact which should not be disturbed.

Though it is conceded that, if damage is suffered as the result of an intrinsic defect in an article which the plaintiff was induced to buy by reason of a fraudulent misrepresentation, the person who made the misrepresentation is liable in tort for that damage, *253 the defect in the turret holes here was not an intrinsic defect but an obvious defect, and the damage suffered by lost time in getting it put right is too remote; it cannot be said to flow from the misrepresentation or from action taken in reliance on it. The measure of damage adopted in the London County Freehold and Leasehold case [FN12] is wholly inappropriate here; there the subject-matter of sale was a unique property believed to be worth £611,000; here the lathe has an easily ascertainable market value, and the measure of damage is the usual one, the difference between what the plaintiff paid and the market value of the machine on that date. [Waddell v. Blockey [FN13] was also relied on.]

FN12 [1936] 2 All E.R. 1039 .

FN13 (1879) 4 Q.B.D. 678.

On the defendants' cross-appeal the issue for decision is the true standard of proof to be applied in a civil action where fraud is alleged. The burden was on the plaintiff to satisfy the judge that the statement was made, and the judge has said that he was satisfied and at the same time had a reasonable doubt; that is what Bucknill L.J. described in Bater v. Bater [FN14] as "an impossible state of mind."

FN14 [1951] P. 35, 36; 66 T.L.R. (Pt. 2) 589; [1950] 2 All E.R. 458.

The authorities show that the higher standard of proof beyond reasonable doubt applicable in criminal cases applies in civil courts only where there is either a specific charge of crime or a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                 Page 5

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

specific charge of fraud which for this purpose has been assimilated to crime. The cases fall into four main groups: (1) Cases where there was a specific charge of crime: Thurtell v. Beaumont [FN15] and Herbert v. Poland [FN16]- two insurance cases where there were allegations of arson against the plaintiff, in both of which the higher standard of proof beyond all reasonable doubt was applied; and two actions for libel where the defence pleaded justification and alleged a crime - Chalmers v. Shackell [FN17] and Willmett v. Harmer [FN18]- in both of which the jury-were directed to decide as on indictment for the offence alleged in the justification. (2) Matrimonial proceedings; and in these the House of Lords has now laid down, in Preston-Jones v. Preston-Jones, [FN19] that the word "satisfied" in the Matrimonial Causes Act, 1950, imports proof beyond reasonable doubt; Lord MacDermott [FN20] said that that standard was required because of the gravity and public importance of the issues involved. (3) The "third party" cases, namely, those where an allegation of crime is made not against a party *254 to the proceedings but against some third party: Vaughton v. London and North Western Railway Co., [FN21]Boyce v. Chapman and Brown [FN22] and Hurst v. Evans. [FN23] In those cases the lower civil standard was applied. That is plainly inconsistent with the decisions in group (1) (supra); for though in Vaughton's case [FN24] and in Boyce v. Chapman and Brown [FN25] the justification for applying the civil standard of balance of probability might be that there was only a general allegation of crime against persons unnamed, in Hurst v. Evans [FN26] the third party against whom a specific crime was alleged was a named person.

FN15 (1823) 1 Bing. 339 .

FN16 (1932) 44 Ll.L.Rep. 139.

FN17 (1834) 6 C. & P. 475.

FN18 (1839) 8 C. & P. 695.

FN19 [1951] A.C. 391; [1951] 1 T.L.R. 8; [1951] 1 All E.R. 124.

FN20 [1951] A.C. 391, 417.

FN21 (1874) L.R. 9 Ex. 93.

FN22 (1835) 2 Bing.N.C. 222.

FN23 [1917] 1 K.B. 352; 33 T.L.R. 96.

FN24 L.R. 9 Ex. 93.

FN25 2 Bing.N.C. 222.

FN26 [1917] 1 K.B. 352.

[MORRIS L.J. Surely in the third party cases the standard ought to be higher, for the person against whom the crime is alleged is not there to defend himself. If the proceedings are reported he may be condemned in the eyes of the world.]

[HODSON L.J. That applies in all cases. One cannot get a logical result from a consideration of these authorities. The first group must have been wrongly decided.]

It is clear that, though there is no moral justification for it, the courts have drawn a distinction in cases where the fraud or crime alleged is that of a third party, and have not required the higher standard to be applied. (4) The residuary group of cases, in which a charge of fraud or fraudulent statement has been made in the course of civil proceedings. Although the pronouncements relied on in these cases are admittedly only dicta, it is submitted that one of them - Elfie A. Issaias v. Marine Insurance Co. Ltd. [FN27]- is binding on this court, for the submissions of eminent leading counsel - Lord Halsbury K.C. and Mr. R. A. Wright K.C. (later Lord Wright) - show that the specific point as to the standard of proof was raised, and the Court of Appeal, discharging the plaintiff from the finding of "guilty" by Bailhache J., adopted the higher standard of proof beyond all reasonable doubt. In that case it was alleged that a shipowner in an insurance claim had connived at the scuttling of his ship.

FN27 (1922) 13 Ll.L.Rep. 381; (1923) 14 Ll.L.Rep. 1, 395, 464 et seq.; (1923) 15 Ll.L.Rep. 186(C.A.).

[DENNING L.J. A case of scuttling is like the cases alleging arson; the charge ought to be proved beyond reasonable doubt because it is so grave.]

Scuttling a ship is not a crime unless it is one of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                        Page 6

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

Her Majesty's ships or there is an attempt to defraud underwriters. Though *255 it is conceded that in Lek v. Mathews [FN28] Lord Sumner's speech [FN29] appears to support the adoption of the lower standard of balance of probability and is to that extent inconsistent with the Issaias case, [FN30] the point as to standard of proof does not appear to have been argued in Lek v. Mathews, [FN31] and the dictum of one of their Lordships in the House of Lords cannot overrule the decision of all the members of the Court of Appeal after argument on that specific point -in the Issaias case. [FN32][Demetriades & Co. v. Northern Assurance Co. [FN33] was also referred to.] Devlin J. in Armstrong v. Strain [FN34] also appeared to indicate that where fraud is alleged the higher standard applies. The court is not asked to lay down broad general principles covering standards of proof in every possible type of civil action, but only to say that on the authorities as they stand proof beyond a reasonable doubt, whether qualified by considering it a criminal standard or not, is required where a charge is made either of a specific crime or of fraud.

FN28 (1927) 29 Ll.L.Rep. 141.

FN29 Ibid. 164.

FN30 15 Ll.L.Rep. 186.

FN31 29 Ll.L.Rep. 141.

FN32 15 Ll.L.Rep. 186.

FN33 (1923) 17 Ll.L.Rep. 327(H.L.).

FN34 [1951] 1 T.L.R. 856 , 861 (K.B.); [1952] 1 K.B. 232; [1952] 1 T.L.R. 82; [1952] 1 All E.R. 139 (C.A.).

[DENNING L.J. If that is correct, and a statement is made which is both a warranty and a fraud, the court would be driven to saying that the warranty was to be decided on the lower and the fraud on the higher standard. That would be bringing the law into contempt.]

If the plea is both in warranty and fraud the higher standard must be applied. [Cooper v. Slade [FN35] was cited for the earliest use, per Willes J., of the words "preponderance of probability"; and Miller v.

Minister of Pensions, per Denning L.J., [FN36] that "proof beyond reasonable doubt" did not mean "beyond a shadow of doubt."]

FN35 (1858) 6 H.L.C. 746, 772.

FN36 [1947] W.N. 241; 63 T.L.R. 474; [1947] 2 All E.R. 372.

Gibson in reply. Though the Issaias case [FN37] is claimed as a clear decision of an appellate court on the proper standard of proof when considered as an abstract code of law, Lek v. Mathews [FN38] is equally authoritative. The so-called authorities are not so cogent as they would be if this particular point had been argued. The correct statement of the law is that of Denning L.J. in Bater v. Bater, [FN39] namely, that the degrees of probability must be commensurate with the subject-matter. Thurtell v. Beaumont [FN40] is *256 not a continuing authority, and that which the county court judge in the present case said about the position of the parties at that date is adopted here. Herbert v. Poland [FN41] was wrongly decided and is inconsistent with Hurst v. Evans. [FN42]

FN37 15 Ll.L.Rep. 186.

FN38 29 Ll.L.Rep. 141.

FN39 [1951] P. 35, 36-37.

FN40 1 Bing. 339.

FN41 44 Ll.L.Rep. 139.

FN42 [1917] 1 K.B. 352.

[DENNING L.J. Unless the point is particularly argued most people would say that where there is a serious allegation such as arson there must be a very high degree of proof: see per Lord Goddard C.J. in Regina v. Hepworth and Fearnley [FN43] on the difficulty of understanding how there can be two standards.]

FN43 [1955] 2 Q.B. 600, 603, [1955] 2 All E.R. 918.

The county court judge did not misdirect himself on the standard of proof; he said that he must be satisfied on balance of probability having regard to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                     Page 7

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

the nature of the allegation, and that in a civil action one does not require that particular degree of certainty required by the criminal law, because in a civil action the court is not handing out retribution but balancing the rights of the parties. It is not possible to find one principle covering all the cases; but where the criminal test has been applied it indicates the attitude of the court in approaching such problems as arose in the insurance and in the libel cases. The judge's finding, that the statement was made should not be disturbed.

*Cur. adv. vult.*

Nov. 20. DENNING L.J.

The question in this case is whether Mr. Neuberger orally represented to the plaintiff that a certain capstan lathe had been "Soag reconditioned." I should have thought it was a simple question of fact for the judge to decide on the evidence, but it has become so mixed up with questions of law that the case took many days in the court below and over two days before us. To make the position clear I must give the history of the machine. [His Lordship stated the facts as set out above, and continued:] The judge seems to have found it difficult to make up his mind whether Mr. Neuberger made that representation [that it was Soag reconditioned] or not. The judge said that his decision depended on the standard of proof which was to apply. If he was to apply the standard in civil cases - the balance of probability - he would hold that the representation was made by Mr. Neuberger: but if he was to apply the standard in criminal cases - proof beyond reasonable doubt - he would hold that the representation was not made.

**\*257** Such being the judge's state of mind, he considered first whether there was a contractual warranty. On that issue the civil standard of proof clearly applied. He found on the balance of probabilities that Mr. Neuberger did say that the machine had been Soag reconditioned, that Mr. Neuberger made it in order to persuade Mr. Hornal to enter into the transaction, and that Mr. Hornal relied upon it: but he found that it was not a contractual warranty because it was not so intended. I do not think we can disturb that finding. The judge clearly had in mind the speech of Lord Moulton in Heilbut, Symons & Co. v. Buckleton [FN44] and directed himself by it. It was said that the judge

made a mistake in that he tried to look into the minds of the parties to see if in their inmost thoughts they intended a warranty: whereas he ought only to have looked at their external behaviour to see whether it bore the reasonable inference of a warranty. Now I quite agree that if the judge did try to look into their inmost thoughts it would be a mistake. In seeing whether there is a contract or not, the law can only look to outward appearances. If an intelligent bystander would reasonably infer that a warranty was intended that will suffice, even though neither party in fact had it in mind. This is such trite law that I do not think for a moment the judge fell into error about it. It is true that in one passage he used words which seem to suggest that he was looking into the minds of the parties: but in another passage he approached the matter in the correct way. He said that one of the matters that impressed him most was the plaintiff's complete failure to refer in any document to this machine being Soag reconditioned. That is a factor always considered in these cases. Thus having disposed of the warranty the judge turned to consider whether Mr. Neuberger was guilty of fraud. If Mr. Neuberger did in fact represent that the machine had been Soag reconditioned, he was clearly guilty of fraudulent misrepresentation, because he knew it was not true. He had got £ 300 from his German supplier because it had not been reconditioned. So the only question was whether Mr. Neuberger made the representation or not. It was there that the judge ran into difficulty - about the standard of proof. He said: "If I have to be satisfied beyond all reasonable doubt, I should not be so satisfied in regard to the statement that it was Soag reconditioned. I have come to the conclusion on the preponderance of probability that the statement was made; but in my view no jury would dream of convicting a defendant of a fraud based on that statement, **\*258** and if I had to consider whether, sitting as a magistrate trying a case of false pretences, I should convict Mr. Neuberger of making this statement, I have no hesitation in saving I should not dream of doing so."

FN44 [1913] A.C. 30.

In setting himself this problem the judge showed an uncommon nicety of approach. I must say that, if I was sitting as a judge alone, and I was satisfied that the statement was made, that would be enough for me, whether the claim was put in warranty or on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                  Page 8

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

fraud. I think it would bring the law into contempt if a judge were to say that on the issue of warranty he finds the statement was made, and that on the issue of fraud he finds it was not made.

Nevertheless, the judge having set the problem to himself, he answered it, I think, correctly. He reviewed all the cases and held rightly that the standard of proof depends on the nature of the issue. The more serious the allegation the higher the degree of probability that is required: but it need not, in a civil case, reach the very high standard required by the criminal law. Take this very case. If Mr. Neuberger did represent that the machine was Soag reconditioned he did very wrong because he knew it was untrue. His moral guilt is just as great whatever the form of the action, no matter whether in warranty or in fraud. He should be judged by the same standard in either case.

I have already expressed my views on this subject in Bater v. Bater [FN45] and I need not repeat them here. I would only mention the insurance cases on which Mr. Stamler especially relied, in which the insured person tried to defraud the insurance company by burning down his house or scuttling his ship. In some of those cases, particularly Thurtell v. Beaumont [FN46] and Issaias v. Marine Insurance Co. Ltd., [FN47] the judges have said that the offence of arson or malicious damage must be as fully proved as a criminal charge: but the latest case in the House of Lords, Lek v. Mathews, [FN48] shows that that is putting too high a burden on the insurance company. Lord Sumner said that [FN49]"on a civil issue I do not think more is required than a correct appreciation of the incidence and the shifting of the onus of proof and a reasonable estimate of the weight pro and con of the various parts of the evidence. ... I am just as reluctant to make the underwriters pay Mr. Lek many thousands of pounds, if he has been guilty of making a false claim, as to find him guilty *259 of it if he has not. The whole question is whether it has been proved; and I think it has." It is apparent that Lord Sumner considered that proof was only necessary according to the civil standard.

FN45 [1951] P. 35, 36.

FN46 (1823) 1 Bing. 339.

FN47 (1923) 15 LL.L.Rep. 186.

FN48 (1927) 29 LL.L.Rep. 141.

FN49 Ibid. 164.

It is unnecessary to discuss here the difference between the criminal standard and the civil standard. I tried to define it in Miller v. Minister of Pensions. [FN50] Suffice it to say that the judge, applying the civil standard, found that Mr. Neuberger represented that the machine had been Soag reconditioned, and I do not think that this finding should be disturbed. It can readily be reconciled with his finding that there re was no contractual warranty. Suppose that Mr. Neuberger used some such words as these: "It has, I believe, been Soag reconditioned. At least when I bought it I was told it had been told." There would then be no contractual warranty because Mr. Neuberger was only passing on what he had been told, as happened in Routledge v. McKay [FN51] and the recent decision of Oscar Chess Ltd. v. Williams [FN52]: but the would be a fraudulent misrepresentation because the statement conveyed the false impression that it had been Soag reconditioned, whereas Mr. Neuberger knew it had not.

FN50 (1947) 63 T.L.R. 474.

FN51 [1954] 1 W.L.R. 615 ; [1954] 1 All E.R. 855.

FN52 Judgments of the Court of Appeal 1956, No. 302.

There remains, however, one more question. Despite his findings that the representation was made the judge dismissed the plaintiff's claim for fraud, because he said he had suffered no damage. He said that the machine was worth quite as much as the £400 the plaintiff paid for it, and very likely more, and that therefore the plaintiff could not recover. I do not agree. The judge had already found that the representation was made in order to persuade the plaintiff to buy the machine, and that the plaintiff did to some extent rely on it. It influenced his mind. I ask myself: how did it influence him? We do not know exactly, but we do know he got the impression that the machine was fit for immediate use. The representation that it had been Soag reconditioned would certainly have helped to produce that impression. He took the machine in the belief that it was fit for immediate use, whereas it was not: and he was put to seven

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                          Page 9

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

(Cite as: [1957] 1 Q.B. 247)

weeks' delay in getting it put right. That is, I think, a head of damage which can properly be said to flow from this fraudulent misrepresentation. The judge put it at some £20 to £30.

Another way of approaching the case is to ask: what would have been the position if the statement had not been made? We *260 do not know. The plaintiff might have offered less, and got the machine for less than it was worth; or he might not have gone on with the transaction at all, but bought another machine elsewhere, and thus saved himself the seven weeks' delay in getting this one put right. In either case he would have suffered damage. I confess that I do not look kindly on a defendant who, having got the plaintiff to buy a machine by knowingly telling him an untruth, afterwards says he suffered no damage. Why say it except to induce him to buy or to pay a higher price than he otherwise would? In either case he suffers damage. The damage may be difficult to assess. It may only be £20 to £30. But that there was some damage sufficient to support the action, I do not doubt.

This means that Mr. Neuberger was guilty of fraud. The appeal should be allowed and judgment entered for damages to be assessed, but I do hope that they can be agreed: and the cross-appeal should be dismissed.

HODSON L.J.

The county court judge, having reached the conclusion, on the basis of a balance of probability, that a fraudulent statement had been made, found himself unable to find that fraud had been proved beyond all reasonable doubt. Thus he posed himself the question: "In a civil action are criminal standards of proof necessary in considering what is or may be a crime?" This question, after a review of the authorities, he answered in the negative.

The comparative dearth of express authority on this topic is not surprising. No responsible counsel undertakes to prove a serious accusation without admitting that cogent evidence is required, and judges approach serious accusations in the same way without necessarily considering in every case whether or not there is a criminal issue involved. For example, in the ordinary case arising from a collision between two motor-cars involving charges of negligence, I have never heard of a judge

applying the criminal standard of proof, on the ground that his judgment might involve the finding of one of the parties guilty of a criminal offence.

The judge took great pains to consider the cases in which the question he posed had been considered. I do not propose to follow him in their review, agreeing as I do with his conclusion. I agree with him that in most civil cases, where the standard of proof in cases involving crime has been mentioned, there has been no argument, and the heavier burden of proof has been *261 accepted by counsel or assumed as necessary by the judge. I also think that it is impossible to find a satisfactory explanation of all cases where divergent views have been taken. For example, it seems to have been taken for granted in what may be called the third party cases that the crime of a person not concerned in the action may be established on a balance of probabilities: see, for example, Boyce v. Chapman and Brown [FN53] and Vaughton v. London and North Western Railway Co. [FN54] If the criminal standard were required in civil cases for the reason suggested in Taylor on Evidence (12th ed., vol. 1, at p. 106), namely, that every man has a right to his character and not to have the presumption of innocence rebutted unless the strict standard were adopted, the third party cases would appear to be cases where the rule ought to be most strictly applied, since the third party may not even know of the charge which is being made against him in an action between two persons in whose dispute he is not interested, and even if he knows of it may have no opportunity of intervening in it.

FN53 (1835) 2 Bing.N.C. 222.

FN54 (1874) L.R. 9 Ex. 93.

Notwithstanding the existence of some cases where the point appears to have been argued and decided in a contrary sense, I think the true view, and that most strongly supported by authority, is that which the judge took, namely, that in a civil case the balance of probability standard is correct. I propose to refer only to a few of the authorities.

The first is Cooper v. Slade. [FN55] The action was for penalties for bribery under the Corrupt Practices Prevention Act, 1854, which declared the giving or promising of bribes to voters to be a misdemeanor. Willes J., one of the judges who was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                                           Page 10

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

summoned to give his opinion to the House, in the course of his speech said [FN56]: "As a difference of opinion exists upon this question, I may be excused for referring to an authority in support of the elementary proposition that in civil cases the preponderance of probability may constitute sufficient ground for a verdict. I find such an authority referred to in Mr. Best's very able and instructive treatise on the Principles of Evidence (2nd ed., p. 114). So long since as the 14th Eliz., Dyer C.J. and a majority of the other Justices of the Common Pleas laid down this distinction between pleadings and evidence, 'that in a writ or declaration or other pleading certainty ought to be shown, for there the party must answer to it, and the court must adjudge upon it; and that which the party shall be *262 compelled to answer to, and which is the foundation whereupon the court is to give judgment, ought to be certain, or else the party would be driven to answer to what he does not know, and the court to give judgment upon that which is utterly uncertain. But where the matter is gone so far that the parties are at issue, or that the inquest is awarded by default, so that the jury is to give a verdict one way or the other, there, if the matter is doubtful, they may found their verdict upon that which appears the most probable, and by the same reason that which is most probable shall be good evidence."

FN55 (1858) 6 H.L.C. 746.

FN56 Ibid. 772.

In more recent times there is the speech of Lord Sumner in Lek v. Mathews, [FN57] where he said: "With great respect to the Lords Justices it seems to me that what has really made both this forgery theory and this construction of the claim attractive has been a strong reluctance to say that Mr. Lek has tried to cheat and has backed his effort by perjury. This has been supported by a canon, new to me in the form employed, to the effect that such a man as Mr. Lek cannot be convicted of this so long as any reasonable possibility remains of explaining his conduct otherwise. I am afraid I look at it differently and think that this is wholly without authority. When prisoners could not give evidence, such an appeal might have passed muster with a jury, but on a civil issue I do not think more is required than a correct appreciation of the incidence and the shifting of the onus of proof and a

reasonable estimate of the weight pro and con of the various parts of the evidence. Mr. Lek's wealth and reputation are material only as ground for considering the probability of such misconduct. The consequences of a verdict against him are quite immaterial. I am just as reluctant to make the underwriters pay Mr. Lek many thousands of pounds, if he has been guilty of making a false claim, as to find him guilty of it if he has not. The whole question is whether it has been proved; and I think it has." There is in truth no great gulf fixed between balance of probability and proof beyond reasonable doubt. Although when there is a criminal prosecution the latter standard is securely fixed in our law, yet the measure of probability is still involved in the question of proof beyond reasonable doubt.

FN57 29 Ll.L.Rep. 141, 164.

Students are familiar with Professor Kenny's Outlines of Criminal Law (16th ed. (1952)), where the following passage appears at p. 416: "A larger minimum of proof is necessary to *263 support an accusation of crime than will suffice when the charge is only of a civil nature. For in the latter it is sufficient that there be a *preponderance* of evidence in favour of the successful party, whereas in criminal cases the burden rests upon the prosecution to prove that the accused is guilty 'beyond reasonable doubt.' When therefore the case for the prosecution is closed after sufficient evidence has been adduced to necessitate an answer from the defence, the defence need do no more than show that there is *a reasonable doubt* as to the guilt of the accused. See Rex v. Stoddart. [FN58] Even in civil proceedings, e.g. in actions of debt, a mere scintilla of evidence would not warrant the jury in finding a verdict for the plaintiff; for there must (as we have seen) be so much evidence that a reasonable man might accept it as establishing the issue. But in criminal cases the presumption of innocence is still stronger, and accordingly a still higher minimum of evidence is required; and the more heinous the crime the higher will be this minimum of necessary proof. The progressive increase in the difficulty of proof, as the gravity of the accusation to be proved increases, is vividly illustrated in an extract from Lord Brougham's speech in defence of Queen Caroline [FN59]: 'The evidence before us,' he said, 'is inadequate even to prove a debt impotent to deprive of a civil right - ridiculous for convicting of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                      Page 11

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

the pettiest offence scandalous if brought forward to support a charge of any grave character monstrous if to ruin the honour of an English Queen.'" This passage appears in the earlier editions of this work for which the late Professor Kenny was responsible.

FN58 (1909) 25 T.L.R. 612; 2 Cr.App. R. 217, 242.

FN59 Cited inaccurately from Lord Brougham's Speeches, vol. 1, 227, q.v.

Denning L.J. referred both to criminal and civil cases when he expressed the same idea in Bater v. Bater [FN60]: "The difference of opinion which has been evoked about the standard of proof in recent cases may well turn out to be more a matter of words than anything else. It is of course true that by our law a higher standard of proof is required in criminal cases than in civil cases. But this is subject to the qualification that there is no absolute standard in either case. In criminal cases the charge must be proved beyond reasonable doubt, but there may be degrees of proof within that standard. As Best C.J., and many other great judges have said, 'in proportion as the crime is enormous, so ought the proof to be clear.' So also in civil *264 cases, the case may be proved by a preponderance of probability, but there may be degrees of probability within that standard. The degree depends on the subject-matter. A civil court, when considering a charge of fraud, will naturally require for itself a higher degree of probability than that which it would require when asking if negligence is established. It does not adopt so high a degree as a criminal court, even when it is considering a charge of a criminal nature; but still it does require a degree of probability which is commensurate with the occasion."

FN60 [1951] P. 35, 36, 37.

This citation comes from a judgment given on appeal in a divorce case. The House of Lords has now held in Preston-Jones v. Preston-Jones [FN61] that the words of the Divorce Act [the Matrimonial Causes Act, 1950] produce the same result as the rule in criminal cases although divorce cases are civil actions. Nevertheless, on the general question of the standard of proof in criminal and civil cases, I would like to express my complete concurrence with the words used by Denning L.J. in the passage I have cited. Just as in civil cases the balance of

probability may be more readily tilted in one case than in another, so in criminal cases proof beyond reasonable doubt may more readily be attained in some cases than in others.

FN61 [1951] A.C. 391; [1951] 1 T.L.R. 8; [1951] 1 All E.R. 124.

On the other questions of law and fact raised on this appeal and on the issue as to damage, I agree with the judgment of Denning L.J., and also with the judgment which Morris L.J. is about to deliver, which I have had the advantage of reading.

The appeal should be allowed to the extent stated, and the cross-appeal dismissed. I agree with the form of order proposed.

MORRIS L.J.

After a very full hearing which extended over many days, the judge delivered a judgment in the course of which he examined and analysed all the evidence. The plaintiff had become aware that the defendants possessed a Herbert No. 4 capstan lathe. The plaintiff, accompanied by his engineer, went to see it, and had an interview with Mr. Neuberger at which others were present. There was a discussion about the machine. There was bargaining about its price. The plaintiff was shown the gears. The power was turned on. The plaintiff thought that the machine was fit for immediate use and that it would avail him for some work of his that he had in mind. The plaintiff as a result acquired the machine. The acquisition was not effected *265 by direct purchase but by the assisting introduction of a hire-purchase company. The plaintiff affirmed and Mr. Neuberger denied that in the course of the discussion Mr. Neuberger had said that the machine had been "Soag reconditioned." The significance of the phrase in question was well understood by those concerned. It was first of all a question of fact whether Mr. Neuberger had made the alleged statement. The judge held that he had. On that finding the question arose whether what Mr. Neuberger had said had contractual effect. Being an affirmation made during negotiations for a sale, it would not have been surprising if it had been held that the statement had contractual quality. But the judge made a correct approach in law when he considered the totality of the evidence so as to decide whether contractual intention existed. There

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247                                                                                    Page 12

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

was much oral evidence to be considered: there was correspondence which, either by reason of what it contained or by reason of what it did not contain, had some evidential value. The judge had no hesitation in holding that the statement of Mr. Neuberger was not contractual. He held that neither the plaintiff nor Mr. Neuberger had thought it to be. "It was simply a matter of talking about the machine. " Although wrong statements made when someone is about to buy ought not readily to be held to be beyond the frontiers of contract, it seems to me that the judge approached the issue with discrimination. He appears to have applied the correct tests, and, accordingly, I do not think that his conclusion should be displaced.

It is not in dispute that if Mr. Neuberger made a representation that the machine was Soag reconditioned he knew that the representation was false. Accordingly, if the representation was made, then, although there was no warranty, there was an actionable misrepresentation. But here a question arises as to whether the judge misdirected himself when deciding the issue as to whether the two words "Soag reconditioned" were or were not spoken. He has said that if as to this he ought to be satisfied in the way in which a court or a jury would have to be satisfied before convicting in a criminal case, then in this case he was not so satisfied, but he was satisfied if he was entitled to decide the matter as issues in civil actions are decided, that is, according to the balance of probabilities. The precision of this revealed judicial heart-searching is impeccable from the point of view of its logical nicety. The question of fact which the judge had to decide was simply whether Mr. Neuberger spoke the two words in question. If he did, the words might have been a warranty *266 or they might have been a representation, which in this case would be actionable because fraudulent. It would be strange if different standards of proof as to the speaking of the two words could be applicable according as to what civil legal rights followed.

In a criminal case a jury must be directed that the onus is all the time upon the prosecution and that before they convict they must feel sure of the accused's guilt. Authoritative guidance in regard to directing juries in criminal cases is to be found in the judgment of Lord Goddard C.J. in Regina v. Hepworth and Fearnley, [FN62] and in other cases. It has, however, been emphasized that what is vital

is not the mere using of some particular formula of words but the effect of a summing-up in giving true guidance as to the right approach.

FN62 [1955] 2 Q.B. 600; [1955] 2 All E.R. 918.

It is, I think, clear from the authorities that a difference of approach in civil cases has been recognized. Many judicial utterances show this. The phrase "balance of probabilities" is often employed as a convenient phrase to express the basis upon which civil issues are decided. It may well be that no clear-cut logical reconciliation can be formulated in regard to the authorities on these topics. But perhaps they illustrate that "the life of the law is not logic but experience." In some criminal cases liberty may be involved; in some it may not. In some civil cases the issues may involve questions of reputation which can transcend in importance even questions of personal liberty. Good name in man or woman is "the immediate jewel of their souls."

But in truth no real mischief results from an acceptance of the fact that there is some difference of approach in civil actions. Particularly is this so if the words which are used to define that approach are the servants but not the masters of meaning. Though no court and no jury would give less careful attention to issues lacking gravity than to those marked by it, the very elements of gravity become a part of the whole range of circumstances which have to be weighed in the scale when deciding as to the balance of probabilities. This view was denoted by Denning L.J. when in his judgment in Bater v. Bater [FN63] he spoke of a "degree of probability which is commensurate with the occasion" and of "a degree of probability which is proportionate to the subject-matter."

FN63 [1951] P. 35, 36, 37.

In English law the citizen is regarded as being a free man of good repute. Issues may be raised in a civil action which affect character and reputation, and these will not be forgotten by *267 judges and juries when considering the probabilities in regard to whatever misconduct is alleged. There will be reluctance to rob any man of his good name: there will also be reluctance to make any man pay what is not due or to make any man liable who is not or not liable who is. A court will not be deterred from a conclusion because of regret at its consequences: a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1957] 1 Q.B. 247

1956 WL 17565 (CA), [1957] 1 Q.B. 247, [1956] 3 All E.R. 970, [1956] 3 W.L.R. 1034, (1956) 100 S.J. 915

**(Cite as: [1957] 1 Q.B. 247)**

court must arrive at such conclusion as is directed by the weight and preponderance of the evidence.

In my judgment, the judge did not misdirect himself in approaching the case on the basis of the preponderance of probability in deciding that Mr. Neuberger had stated that the machine was Soag reconditioned. It follows that there is liability if damage resulted and if damage was proved. I consider that there was resulting damage as indicated by my Lord, and I agree with the course proposed.

**Representation**

Solicitors: Goodman, Monroe & Co.; C. Butcher & Simon Burns.

Appeal allowed. Judgment entered for the plaintiff With agreed damages of £40. Cross-appeal dismissed. (M. M. H.)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.